Thurman SMITH, Trustee, et al.

v.

INSURANCE COMPANY OF NORTH AMERICA et al.

Civ. A. No. 434.

United States District Court
M. D. Tennessee,
Columbia Division.

Dec. 20, 1962.

Supplemental Opinion Jan. 25, 1963.

See also 30 F.R.D. 540.

Fyke Farmer, Nashville, Tenn., for plaintiff Helen Corinne Scales Trice, executrix of the will of Joe W. Scales, deceased.

Lon P. MacFarland and William B. Cain, MacFarland & Colley, Columbia, Tenn., D. C. Lee, Pulaski, Tenn., Joe W. Henry, Jr., Henry & Henry, Pulaski, Tenn., and Malcolm Marshall, Ogden, Brown, Robertson & Marshall, Louisville, Ky., for defendants Commercial Union Assur. Co., Limited, and others.

GRAY, District Judge.

The overriding issue on the trial of this case was whether the late Joe W. Scales had somebody set fire to his feed and seed mill near Pulaski, Tennessee, July 14, 1956, to collect insurance. The overwhelming weight of the evidence was that he did. The jury said he did not but did say that he had been guilty of fraud, false swearing or willful concealment or misrepresentation of material matters in relation to his claims against the two defendants who insured only grain and other commodities stored in the mill.

Upon the verdict, judgment was entered in favor of the substituted plaintiff, Helen Corinne Scales Trice, Executrix of Scales's will, for $45,000.00 against the seven defendants insuring buildings, machinery and equipment, and a judgment was entered against Mrs. Trice and in favor of the two grain insurers both on her claim against them and on their counterclaim for the statutory bad faith penalty, T.C.A. § 56–1106, the amount of the judgment against her being $3,-000.00. Mrs. Trice has paid this judgment.

By the satisfied judgment, the defendants, Insurance Company of North America and United States Fidelity & Guaranty Company, have been eliminated from the case. By compromise, settlement and agreed order of dismissal the mortgagee-plaintiffs, Thurman Smith and Union Bank of Pulaski, Tennessee, had been eliminated before the case was submitted to the jury. Thus the issues now before the court are entirely be-

tween Mrs. Trice and the seven remaining defendants, Commercial Union Assurance Company, Limited; American National Fire Insurance Company; North British and Mercantile Insurance Company, Limited; Citizens Insurance Company of New Jersey; Queen Insurance Company of America; Home Insurance Company, and New Hampshire Fire Insurance Company. Unless otherwise designated, references to the plaintiff and the defendants hereafter refer to these remaining parties only.

The issues now to be decided were raised by the defendants' timely motions under Rule 50(b), Federal Rules of Civil Procedure, for judgment notwithstanding the verdict and for new trial; by the plaintiff's motion under Rule 60(b) (4), Federal Rules of Civil Procedure, for relief from a portion of the amended judgment entered on the special verdict; and by the plaintiff's notice of appeal from a prior order of the court. Because the issues raised by the plaintiff's actions are jurisdictional, they will be considered first.

## I

*The Plaintiff's Motion for Relief and Notice of Appeal*

Pursuant to the plaintiff's own motion to amend the original judgment of May 25, 1962, the court asked counsel to submit a proposed order. It received two conflicting proposals and the parties submitted briefs on the merits of the proposals. Upon consideration of the briefs the court entered an order July 23, 1962, directing entry of an amended judgment allocating the costs, granting the plaintiff's request for interest on the damages found by the jury, and granting the defendants' proposal that the judgment specifically provide for credit against the judgment for payments made to the mortgagee-plaintiffs under the compromise settlement. Each side then entered a new motion to amend the judgment to eliminate the prior amendment favorable to the opposing party, and the defendants, out of an abundance of caution, also renewed their motions under Rule

50(b). The opposing motions to amend the amended judgment were denied in an order entered October 8, 1962, in which the continuing pendency of the motions under Rule 50(b) was noted. The plaintiff's instant motion for relief was filed thirty days later, on November 7, 1962, and the notice of appeal was filed one minute after the motion. The asserted object of both is to delete from the amended judgment the provision that the defendants should receive credit against the judgment for payments made to the mortgagees under the loss-payable clauses of the policies on which this action is founded. The ground is that the court lacked jurisdiction to amend the judgment in the absence of a timely motion by the defendants.

■■ Neither a motion for relief under Rule 60(b) nor an appeal under 28 U.S.C. § 1291 will lie except to a final judgment. The original judgment involved here has never become final because it was suspended upon the filing of the defendants' timely motions under Rule 50(b) and will remain suspended until these motions are disposed of, Rules 62(f) and 73(a), Federal Rules of Civil Procedure; Waller v. Skeleton, 31 Tenn.App. 103, 212 S.W.2d 690 (M.S. 1948); Phinney v. Houston Oil Field Material Co., 252 F.2d 357 (5th Cir., 1958). The intervening proceedings and orders directed to the form and incidental provisions of the suspended judgment on the suspended verdict are necessarily interlocutory until such time as the judgment amended could come into force.

■ The plaintiff contends, however, that the entry of the amended judgment impliedly overruled all motions inconsistent with it then pending, citing Mosier v. Federal Reserve Bank of New York, 132 F.2d 710, 712 (2nd Cir., 1942); Agostino v. Ellamar Packing Co., Inc., 191 F.2d 576, 577, 13 Alaska 34 (9th Cir., 1951); 42 C.J., Motions & Orders, § 148, p. 511; 60 C.J.S. Motions & Orders § 38, p. 37 at notes 36–38. The origin of this was in Corpus Juris based on state court cases; Mosier cited

C.J.; and Agostino and C.J.S. cited Mosier. The authority may be taken as supporting the rule, but not the application urged by the plaintiff. By its terms and as applied in the cases the rule contemplates that the judgment or order from which the implication arises be inconsistent with granting the motion. In fact, the Mosier case involved a situation in which the judge had specifically overruled the motion in question but had entered no formal order to that effect prior to entry of a final judgment. In the present case, no judgment has become final to the present day. Motions filed by the plaintiff herself were sufficient to keep it from becoming final until October 8, 1962, and the order entered that date specifically noted the continuing pendency of the defendants' motions. Furthermore, the order of July 23, 1962, specifically ordered entry of the amended judgment as of the date of the original one. And even if that order might otherwise have been a final one, the defendants' renewal of their motions challenging the verdict would have been effective to suspend it. Clearly there has been no implication by the court or any indication of any inference by the parties that the defendants' motions were overruled. In a brief filed September 17, 1962, the plaintiff said:

> "The defendants, within ten days after the reception of the verdict, filed the motion for judgment in accordance with their motions for a directed verdict, and in the alternative for a new trial. Thus, they have followed the procedure entitling them to have both motions passed on by the Court."

■■ In any view, there was no appealable order or judgment on which the plaintiff could base her notice of appeal of November 7, 1962. It is true that ordinarily even an appeal that is later dismissed will divest the District Court of jurisdiction during the pendency of the appeal. Commonwealth Ins. Co. of New York v. O. Henry Tent & Awning Co., 273 F.2d 163, 165 (7th Cir., 1959). But the court is not re-

quired to suspend its proceedings while the plaintiff pursues an improvident appeal, Resnik v. La Paz Guest Ranch, 289 F.2d 814, 818 (9th Cir., 1961), particularly where it is apparent that it is a nullity, see United States v. Crescent Amusement Co., 323 U.S. 173, 177–178, 65 S.Ct. 254, 89 L.Ed. 160 (1944). The motion is likewise untimely and must be dismissed.

Even if the motion were properly before the court on its merits, it would have to be denied for several reasons:

■ 1. The plaintiff herself opened the judgment for amendment, treated the defendants' proposals as properly before the court on their merits and briefed them repeatedly prior to the July and October orders without once suggesting that they were untimely. She cannot be heard to raise this technicality now unless she is prepared to show that the court lacked jurisdiction to amend the judgment in any respect, yet she is obviously not prepared to abandon the portions of the amendment favorable to her.

■ 2. The provision to which the plaintiff objects was so obviously implicit in the original judgment that its omission may properly be regarded as an inadvertent error subject to correction at any time under Rule 60(a), Federal Rules of Civil Procedure.

3. The challenged provision is in accord with her testator's original complaint, which she necessarily adopted in reviving the case and which she has never sought to amend.

4. Her bald effort to require the defendants to pay double on a single liability shocks the conscience of the court.

In short, her motion is without any vestige either of legal merit or of good faith.

## II

### Defendants' Motion for Judgment N.O.V.

The defendants moved for directed verdicts on all issues at the close of all the evidence on grounds that the evi-

dence conclusively established the affirmative defenses of fraud, false swearing, willful concealment and misrepresentation of material matters, and arson, and that it conclusively established both the good faith of the defendants in refusing to pay the claims and the bad faith of Scales in bringing suit. They further moved for a directed verdict on the plaintiff's claim under the machinery and equipment coverage of the policies on the ground that there was no competent proof of value as to these items within the definitions of the policies. They now seek judgment in accordance with the motion for a directed verdict.

## A. *Fraud, False Swearing and Willful Misrepresentation*

The uncontradicted evidence, admissions and stipulations show the following facts pertinent to the issue of fraud, false swearing and willful misrepresentation:

1. Scales and Lewis E. Hewgley filed a single joint proof of loss with the General Adjustment Bureau, agent of all eleven of the companies who had fire insurance policies in force on the mill and its contents at the time of the fire, including the nine original defendants in this case.

2. Upon objection by the companies that the proof of loss was not sworn to as required by the policies, both men subsequently filed a joint amendment verifying the entire proof of loss under oath. Scales further verified it on oath under oral examination.

3. This document listed the estimated building loss at $44,200.02, machinery and equipment losses exceeding $50,000.00, and losses on grain and other contents of $32,601.90. The first two figures were applicable entirely to Scales's policies while the figure on the grain and other commodities was divided into $7,101.99 applicable to Hewgley's policy, which is not involved in the present litigation, and $25,499.91 applicable to Scales's policies.

4. The building damage figure included $7,280.00 for wooden grain bins alleged in two places in the proof of loss to have had overall dimensions of 20 feet by 52 feet by 30 feet, which would have had a capacity of 24,960 bushels.

5. The wooden grain bins referred to above actually measured 16 feet wide, 30 feet long, and 17.5 feet high, had a capacity of 6,720 bushels level full and would have cost no more than $3,600.00 to replace with new materials.

6. The proof of loss listed grain and other commodities, including grain presumably stored in the wooden bins mentioned above, variously by bushels and by tons. The total of the bushels was 17,953; the total of the other items listed by weight was more than 57 tons.

7. Only a fraction of the commodities claimed were or could have been in the mill.[1]

There is some evidence in the record that Hewgley may have been the primary source of some of the figures used in the proof of loss, but if that is true it is clear that he provided them as Scales's agent insofar as they related to Scales's claims. Scales ratified them under oath twice after he was or should have been aware that the claims were being challenged. Scales was no innocent pawn like the wives who were exonerated of false swearing on proofs of loss prepared by their husbands in Boston Marine Insurance Co. v. Scales, 17 Pick. (101 Tenn.) 628, 49 S.W. 743 (1899). In the present case Scales was a businessman of wide experience, including long familiarity with fire insurance. It may not be assumed that he did not know the importance of his oath to the insurance companies, or that he didn't know there was no appreciable amount of grain in his mill, or that the wooden grain bins were less than a third the size he represented them to be. He

---

1. This statement gives full weight to testimony of the plaintiff's witness, Frank O. Fitts, in attempted rebuttal of the defendants' grain oxidation expert, Dr. F. A. Griffitts, although Fitts was never properly qualified as an expert.

actively joined Hewgley in describing the grain bins. He swore that the facts in the proof of loss were true knowing either that they were not true or that he did not know they were true. In either case he knowingly swore falsely in matters he knew were material, and he knew that if the insurance companies relied on his word, as they were entitled to do, he would receive thousands of dollars to which he was not entitled. This was an attempted fraud in violation of the implied covenants of all contracts. See 2 Gibson's Suits in Chancery (5th Ed. Crownover) § 978. In the present case, however, it is not necessary to consider the consequences of the violation of implied covenants because each of the insurance contracts contains a specific clause that provides as follows:

"This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto."

Although contracts with eleven insurance companies were originally involved in the claim and nine of them in this lawsuit, the principles are the same as if there were only two—one insuring grain and contents and one insuring buildings, machinery and equipment. The separate policies on grain and contents are no longer directly involved. The seven policies now before the court are all alike, covering buildings, machinery and equipment with a joint maximum coverage of $25,000.00 on the building items and $25,000.00 on the machinery and equipment items. For simplicity, reference hereafter will be to the grain policies as a unit and to the mill property policies as a unit. The two pertinent coverages of the mill property policies will be referred to as the building coverage and the machinery coverage.

In simplest terms, then, the problems are these:

1. Did the attempted grain fraud bar recovery under the mill property policies?

2. If not, did the overstatement of the bin size bar recovery under the building coverage of the mill policies?

3. If so, did it also bar recovery under the machinery coverage?

The plaintiff urges that the first question should be answered in the negative, and cites Epperson v. Westchester Fire Ins. Co., 155 Tenn. 621, 299 S.W. 776 (1927), as controlling authority on the point. In that case the Tennessee Supreme Court held that a daughter who had joined her father in submitting a false proof of loss under one policy would not be prevented from collecting on another separate policy of her own with a different company on different goods in the same building as to which she had submitted an honest claim. The brief opinion in that case indicates strongly that the court did not consider the daughter actually guilty of intentional wrong. In addition, the court said, 155 Tenn. at 622, 299 S.W. at 776:

"From the opinion of the Court of Appeals and examination of the record it does not appear that this petitioner 'swore falsely to any paper which was filed with her company' (Court of Appeals Op. p. 5), or was guilty of making to the representatives of her company any material misrepresentations as to her claim."

The same cannot be said of Scales in the present case. His sworn proof of loss was a single instrument submitted to the agency representing all of the insurance companies. The document received by every one of the companies was the same document, and that document was so steeped in fraud as to render everything in it unfit for presentation in a court of law. The portions of the document where lies were deemed unnecessary can no more be isolated and sanitized than partially fraudulent consideration can render a deed or contract only partially voidable. The Supreme

Court of Tennessee made the point with old-fashioned metaphor a century and a quarter ago in Floyd v. Goodwin, 8 Yerg. (16 Tenn.) 484, 490–491 (1835):

"But should the whole consideration, or only a part thereof be merely a nominal or a colorable consideration, hatched and contrived to hinder, delay and defraud creditors from the recovery of their just and honest debts out of these negroes, the whole contrivance would be void and of no effect. * * * The law feels the wound, when its process is bruised and bleeding under any fraudulent contrivance; and will punish any one who will attempt to contaminate her channels of justice by fraud."

But the joint nature of the proof of loss—Scales's own action in bundling his lies in the same package with the truth—is not the only factor linking all these claims together. The fire was single, the risk was single, and the coverage, though apportioned, was not separated. If Scales had elected to proceed against each insurer separately so as to isolate the lies as far as he could, the matter of the grain loss would still have been a vital consideration to all insurers. Here was where a margin of profit might be found to show a motive for arson. Here was the item that could be moved easily and stealthily before a fire. This was the item as to which the insurers were most dependent on the honesty and accuracy of records kept by the insured. Certainly these insurers of buildings and machinery would not have suffered the allegations to remain separated even if Scales had attempted to separate them. The whole proof of loss must be considered a statement under oath to every one of the defendants, and all of it was material to every one of the claims.

■ The answer to the first question is that the grain fraud attempt rendered the whole contrivance void, and no recovery ought to be allowed against any company victimized by this fraudulent proof of loss from this single fire.

■ But let it be supposed that the answer were otherwise for purposes of considering the other two questions. So far as it affects the building coverage of the mill policies, the overstatement of the size of the wooden grain bins was not apparently designed to increase the amount of recovery. An honest contractor estimated the damage to other building items at figures totaling well above the maximum coverage of the policies, and the indications are that additional building items might have been listed truthfully. But the narrow margin by which the plaintiff managed to top the building coverage maximum when it came down to proof on this trial[2] is sufficient to indicate the fallacy of this argument. Assume, however, in the plaintiff's favor, that Scales had no intention to defraud the property insurers in overstating the size of his grain bins. Let it be supposed that he only intended to buttress and cover up his fraud upon the grain insurers. But (to paraphrase from Claflin v. Commonwealth Ins. Co. of Boston, Mass., 110 U.S. 81, 3 S.Ct. 507, 516, 28 L.Ed. 76 (1884)), what is that, but that he was induced to make statements, known to be false, intended to deceive the present defendants, lest they might discover, and others through them, the falsity of his claims against their co-defendants who insured only grain? And the Supreme Court's conclusion in Claflin would need only a change of factual details to apply with even greater force in the present case:

"* * * and it is no palliation of the fraud that Murphy did not mean

2. The contractor's figure for replacement of the oversized wooden grain bins was excluded on objection to the hearsay dimensions, and he disclosed that his figures for steel tanks were mere guesses. Thus, on direct examination he established a total of no more than $22,-233.62 for the cost of replacing damaged buildings with *new* materials. This figure was raised to $25,833.62 when he supplied on cross examination an estimate for the bin based on the correct dimensions given him by defense counsel.

thereby to prejudice them, but merely to promote his own personal interest in a matter not involved in the contract with them. By that contract the companies were entitled to know from him all the circumstances of his purchase of the property insured, including the amount of the price paid and in what manner payment was made; and false statements, wilfully made under oath, intended to conceal the truth on these points, constituted an attempted fraud by false swearing which was a breach of the conditions of the policy, and constituted a bar to the recovery of the insurance."

In the present case the false statements were more closely related than those in Claflin, and the false statement to the building insurers here was more directly material to a proper determination of the claims against them than the one to the insurer in Claflin.[3]

Furthermore, the companies and the court were and are entitled to look to the established attempt at fraud on the grain claims to give color and meaning to the vast overstatement of the grain bin dimensions. As the Supreme Court of Tennessee said in a different context in Summers v. Howland, 2 Baxt. (61 Tenn.) 407 (1873):

"We do not say the fact that one conveyance, made at the same time, as others, to different parties, is or might be shown to be fraudulent, would be conclusive upon the others, but the fact might in connection with other circumstances, furnish the ground for weighty inferences tending in that direction, and should be looked to in arriving at a conclusion in such a case."

■ Therefore, the second question, too, must be answered against the plaintiff, leaving for determination the third question whether this defense is also good as to the claims under the machinery coverage. This may be briefly answered by reference to a Tennessee case in direct point. Insurance Co. v. Connelly, 20 Pick. (104 Tenn.) 93, 56 S.W. 828 (1900). There the court held that the false swearing as to personalty barred recovery as to both personalty and realty, although the coverage limits of the policy were separately stated as they are here. Furthermore, the court held that the result would have obtained even if the two coverages were deemed severable for other purposes, 20 Pick. at 97, 56 S.W. at 829. And it is at least doubtful if that court would hold the realty and personalty coverages of the present policies severable. See Payne v. Eureka-Security Fire & Marine Ins. Co., 173 Tenn. 659, 122 S.W.2d 431 (1938), affirmed on rehearing, 175 Tenn. 134, 133 S.W.2d 456 (1939).

The Connelly case, of course, was not an action at law but a suit in equity to enjoin an action at law. But there is no indication that the Tennessee courts apply the technical distinction between fraud in equity and fraud at law except in evaluating doubtful evidence or in adjusting the remedy where there are equities on both sides. See 1 Gibson's Suits in Chancery (5th ed. Crownover) § 456, n. 73, p. 521.

Under the uncontradicted evidence, the defendants' motion for a directed verdict should have been granted as to the plaintiff's claims against them on the grounds of attempted fraud, false swearing, and willful misrepresentation in the proofs of loss and oral proceedings subsequent to the fire. It follows necessarily that they were also entitled on the same grounds to a directed verdict on the issues of their own good faith and the bad faith of Scales. It follows further that the defendants are entitled to have the verdict as to these issues set aside and judgment entered in their favor in ac-

---

**3.** There are indications in this record that the present case might have been even more directly analogous to Claflin than this comparison would indicate in view of the hazy nature of the evidence of the consideration for Hewgley's transfer of title to Scales, but this has not been developed for consideration here.

cordance with the verdict that should have been directed. The question whether the amount of damages recoverable on the counterclaim for the bad faith penalty provided by T.C.A. § 56–1106 should have been or should hereafter be submitted to a jury will be reserved until the hearing that must in any event be held on the other issues raised by the counterclaims that were not submitted to the jury.

### B. *Arson*

 The evidence on the issue of arson was conflicting. Therefore, no directed verdict could have been granted on that ground.

### C. *The Good Faith Issues*

The defendants' good faith was conclusively established by the plaintiff's own evidence in chief, and the court probably should have removed this issue from the case at the close of the plaintiffs' evidence. See Niagara Fire Ins. Co. v. Bryan & Hewgley, Inc., 195 F.2d 154 (6th Cir., 1952). Be that as it may, the jury found for the defendants on this issue, and to this extent the jury's verdict is approved.

 Considered aside from the evidence on the issues of arson, fraud, false swearing and willful misrepresentation, there is nothing on which to predicate a finding that Scales brought the lawsuit in bad faith. It is only in conjunction with a finding of arson, fraud, false swearing or willful misrepresentation that a judgment for the statutory bad faith penalty, T.C.A. § 56–1106, could be supported against him.

### III

### *The Motion for New Trial*

In the event the ruling on the motion for judgment notwithstanding the verdict should be set aside in any subsequent proceedings, then the rulings set out hereafter on the issues raised by the motion for new trial will apply. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940).

### A. *Admissibility and Sufficiency of the Plaintiffs' Evidence in Chief*

The defendants now challenge the entire testimony of all of the plaintiff's witnesses in chief on the question of damages on grounds that it was irrelevant and incompetent for that purpose.

No such objection was preserved on the trial as to the testimony of Ernest Prosser, the contractor on whose estimates the building loss claim was based, and even if an exception had been preserved it would now be moot. Defense counsel conceded in open court that the agreement with the mortgagees removed this issue from the case.

 The defendants' objections were properly made and renewed at every opportunity as to the testimony on the value of machinery and equipment. It is true that the evidence of the destruction and value of machinery and equipment fell short of proving all the items claimed in the proof of loss and failed to establish directly the value as defined in the policies, but it was not incompetent or inadequate to support the verdict. Each of the witnesses was fully qualified to give the testimony he gave, and the jury was fully informed of the limitations and weaknesses of that testimony. The jury would not have been justified in accepting the figures given by the witnesses as figures meeting the definitions of value set out in the policies. As it happened, it did not so accept them. The lowest total submitted—by a witness presumably friendly to the defendants—was $42,000.00. The coverage limit of the policies in this category was $25,000.00. The jury awarded damages in this category of only $20,000.00.

The standard urged by the defendants would be too strict for many honest fire victims to meet and would set a premium on manufactured evidence. The correct principle is set out in 31 C.J.S. Evidence § 181, p. 882, as follows:

"Value, whether intrinsic or as regulated by the 'market,' is a quality so subtle and intangible, is a function of so many variables and these,

frequently, of such a trivial nature, where intrinsic, it is so largely a matter of individual estimate or opinion, and when judged by the market its standards so largely consist of the opinion not under oath of a large and usually indefinite number of persons as indicated by trade lists, prices current, and other publications more or less official, that a relaxation of strict rules of evidence is necessary, and use must be made of such probative methods as are available. Value or market price may be shown by either direct or circumstantial evidence."

The challenged testimony was not direct evidence of value as defined in the policies, but it was circumstantial evidence from which the jury could arrive at a reasonable estimate of the value, as defined, of the machinery and equipment actually shown to have been destroyed.

The special objection to the testimony on recall of Roy B. Arney, Mrs. Trice's brother-in-law, was more soundly based. The transcript discloses that Arney was allowed to remain in the courtroom in violation of the rule of exclusion after the plaintiff's counsel had indicated an intention to recall him and after repeated warnings to counsel to keep witnesses out of the courtroom. However, this question has become moot along with objections to Prosser's testimony for the reasons already mentioned.

B. *Admissibility of the Testimony of L. E. Hewgley, Plaintiff's Rebuttal Witness, and of the Defendants' Proffered Impeachment Evidence*

Hewgley, one of the original owners who built the mill and the sole owner, through a corporation, at the time he sold it to Scales in the fall of 1955, was presented by the plaintiff as a rebuttal witness. The defendants objected that part of his testimony was not proper rebuttal and that part going to the question of value was excluded. The present assignment applies only to testimony of value, and it is therefore not well founded,

The defendants further insist upon their exception, properly preserved for review, to the court's refusal to allow them to introduce a decree of another court to discredit Hewgley. This decree, handed down by the Chancery Court of Giles County, Tennessee, in the related case of L. E. Hewgley Seed Co. vs. Travelers Insurance Co., amounts to a judicial determination that Hewgley was a liar. It was obvious that the defendants needed something to assist in breaking the smooth front he presented in the face of their cross-examination. But the court cannot be faulted for excluding this decree, which was highly prejudicial on the merits of this case, even if it had discretion to admit it, when the defendants failed to make use of a more satisfactory means of impeachment available in this very record. There was already in evidence, in the proof of loss to which Hewgley had subscribed under oath, a resounding lie already shown and conceded to have been false; yet Hewgley was not asked a single question about it.

Furthermore, the defendants have cited no authority in support of their contention that the decree was admissible. Such authority as the court has had called to its attention is persuasive that it would have been error for the court to have admitted it. See 98 C.J.S. Witnesses § 470, p. 348, text at note 31.

There was no error of which the defendants may now take advantage in the reception of Hewgley's testimony or in the rejection of the decree proffered by the defendants.

C. *Instructions to the Jury*

The defendants' exceptions to the court's refusal to give the jury three requested instructions will be passed over lightly. The charge of the court as given fully and correctly covered the points of law included in the three requests. It was not error to refuse to repeat them. The other objections to the instructions are more serious.

■ The defendants allege the court erred in giving the jury the plaintiff's requested instruction No. 4. The instruction was not given exactly as requested, but was given in this amended form:

"Evidence that a witness has, on prior occasions, made contradictory statements is received only for the purpose of impeaching his credibility as a witness, and is not to be considered as establishing the truth of a prior contradictory statement."

Admittedly this rule of law is subject to severe criticism. A prior contradictory statement would have no reasonable tendency to impeach testimony if it did not also have a tendency to establish the truth of the matters asserted in it. The only basis for objection is the hearsay rule, and none of the dangers of hearsay are present here. See 3 Wigmore, Evidence, § 1018. Such reason as the rule may contain would be much better applied by the jury in the same way it is expected to resolve other conflicts in testimony. Nevertheless, the rule as given represents the present law in Tennessee, King v. State, 187 Tenn. 431, 215 S.W.2d 813 (1948), and the court cannot say that including it in its charge on request was an error requiring a new trial.

The defendants made timely objection to the court's action in submitting Special Interrogatory No. 2 to the jury separating the fraud, false swearing and willful misrepresentation issue into four categories—(a) grain policies, (b) building coverage, (c) equipment coverage, and (d) other matters. It does not appear that this division was misleading. The failure of the jury to find fraud in relation to the building coverage because of the overstatement of the size of the grain bins was more likely a misinterpretation of the evidence. The failure of the court to direct a verdict as to all defendants based upon the jury's finding of fraud in relation to the grain policies was not attributable to a defect in the form. It was merely a repetition of the same error of law that led the court not to grant the motion for a directed verdict at the close of the evidence. Nor was there any necessary prejudice to the defendants in obtaining a more detailed report of the jury's findings on this question.

The defendants further allege that the court should not have submitted the question of value of building items to the jury because the defendants had already settled this issue by agreement with the mortgagee-plaintiffs. The contention is sound, but it is difficult to see how the defendants were or could have been prejudiced by the court's oversight in submitting the issue after indicating its intention not to do so.

There was no error in the instructions to the jury calling for a new trial.

D. *Weight and Sufficiency of the Evidence*

■ By every combination of words known to the form books, the defendants challenge the sufficiency of all the evidence to support the verdict. There can be no doubt that the court has the duty of weighing the evidence on such a motion, although the standard to be applied is not Tennessee's "13th juror" rule. Werthan Bag Corp. v. Agnew, 202 F.2d 119 (6th Cir., 1953). The proper test in the federal trial courts of this circuit was given in the Agnew case this way:

"In Felton v. Spiro, supra [[6 Cir.] 78 F. 576, 581], Chief Justice Taft, then a member of this court, wrote an instructive opinion upon the subject matter making it clear that it is the duty of the trial judge 'to consider whether the verdict was against the great weight of the evidence' * * *."

In the present case, the evidence was such that the result would be the same under either the Tennessee or Sixth Circuit rule for weighing the evidence after verdict. Considered apart from the evidence relating to arson and fraud, the verdict finds ample support in the record. Technical defects in the proof of loss, if any, were effectively waived, all the evidence indicating that the defendants con-

sidered the proof to have been properly submitted as of the date the sworn amendment to it was filed. The amount of the loss was not conclusively established but it was well supported by the evidence. The policies were in full force at the time of the fire. If it were not for the evidence of arson and fraud the court would be content to approve the verdict either as 13th juror or otherwise.

The arson and fraud issues are another matter. As set out in Part II, supra, evidence establishing fraud, false swearing and willful misrepresentation of a nature vitiating all of the policies sued on in this action stands uncontradicted. Even if the court's action in granting judgment notwithstanding the verdict on this issue should be set aside, justice would still require a new trial on the issue.

■■■ There was enough conflicting evidence on the arson issue to preclude a directed verdict on that ground, but the evidence tending to establish arson was so ponderous and so slightly rebutted that the jury's verdict cannot be allowed to stand. With all the presumptions in favor of the verdict of a jury and with full allowance for the jury's prerogatives in judging the credibility of witnesses, the preponderance still lies heavily in the defendants' favor.

If this case had been tried by the court on the evidence presented to the jury, the findings of fact pertinent to the arson issue would have been these:

1. Joe W. Scales, at the time of the fire that brought on this lawsuit, already had a record of eleven previous insured fire losses in plants in which he had an interest as mortgagee, owner or otherwise, involving insurance payments in excess of half a million dollars over a period of thirty years.

2. Scales obtained title to this mill in a transaction with Lewis E. Hewgley for a consideration that was the subject of rather evasive testimony by both Scales and Hewgley. The transaction occurred after Hewgley had operated the mill at a loss for several years, and

Scales promptly reduced the operation to little more than a warehouse plus a private feed-grinding facility serving the cattle farms of himself and close associates. The plant was a special-purpose plant that could not easily be converted to other uses. The consideration as disclosed, with the outstanding mortgage indebtedness, implied a valuation of no more than $70,000.00 or $80,000.00 for the mill and the valuable industrial tract with long rail and highway frontages and it may well have been much less. The outstanding insurance on the buildings and equipment totaled $56,000.00. The valuations of the machinery, without considering any discount for transportation to a market, plus the replacement cost of the buildings exceeded this amount. The situation was clearly one in which arson could have been profitable.

3. About two months before the fire, Scales paid an extra premium for permission of his grain insurers to move certain grain from a building that was not burned to one that was burned.

4. During the two or three weeks before the fire, big trucks entered the plant empty and hauled away goods in sacks steadily enough to attract the notice of neighbors.

5. Several days before the fire, R. C. Jones learned from Scales that the plant was going to burn.

6. A few days before the fire, a certain Grain Vayor, valued in the proof of loss at $3,948.00, was moved up near the portion of the plant that burned from a corner of the property where it had stood unused for a year or more.

7. During the last two or three days before the fire, employees at the plant crushed a great deal of hay and stacked it around the machinery. This was an unusual time of year for such an operation in the area.

8. The day before the fire Jones and Audie Allen hauled milk cans from Jones's farm and Scales's farm to the mill at Scales's request, and these were used as containers for gasoline in preparation for the fire.

9. On the morning of Saturday, July 14, 1956, Scales promised James Nelson $50.00 if he would assist in setting the fire and arranged for R. C. Jones to pick Nelson up in Pulaski and deliver him later to a rendezvous with another accomplice for the purpose, and Jones did so.

10. Late in the afternoon of July 14, 1956, Lewis E. Hewgley visited C. B. McKnight, who lived and operated an old car sales lot immediately across the road from the mill.

11. In the late afternoon and night of July 14, 1956, before the fire, Mr. and Mrs. C. B. McKnight were expecting the mill to burn that night and were under instructions from somebody not to call the fire department.

12. On the night of July 14, 1956, before the fire, Mr. and Mrs. R. C. Jones were watching the sky in the direction of Scales's mill in anticipation of a big fire.

13. Some time after dark on the night of July 14, 1956, James Nelson and a white accomplice entered the mill and set it afire, using hay and gasoline previously placed there.

14. Scales was attending a movie at a nearby drive-in theater when the fire broke out, was notified of the fire by the manager, and went immediately to Pulaski to post the $50.00 guarantee required by the city fire department before making fire runs beyond the city limits.

15. Firemen arrived at the plant expecting to find a source of water in an old basement they had used for that purpose previously and found the basement had been filled in.

16. When Fire Inspector Thomas R. Williamson asked Scales about sending for the department's third and last truck to make up enough hose to reach the nearest hydrant, Scales said, "Let the damned thing burn. It is insured."

17. The big, wooden compartmented grain bin collapsed in the fire in less than two hours and observers could see that there was little or no grain in it.

18. Some time after the fire Scales asked Williamson, "What is your price?"

under circumstances clearly meaning the price of his silence about facts pertinent to Scales's fire loss.

19. On Monday and Tuesday after the fire, July 16 and 17, there was a quantity of grain, probably mostly oats, smoldering in or beneath the seven 750-bushel steel grain tanks west of the big wooden bin, there was a seven-foot circle of smoldering grain and similar debris about knee deep on the floor of one of the ruined buildings, there were about 750 bushels of corn smoldering in a 5,000-gallon steel tank attached to a quonset-type building north of the wooden bin, and there was about a pickup-truck load of smoldering grain or similar commodities within the foundations of the destroyed wooden grain bin. There was no other evidence of grain or other commodities damaged by the fire, and no grain was spilled out in the area around the wooden bin.

20. Although there appears to have been no contention that any records were destroyed in the fire, Scales did not produce adequate records of grain inventory for the company auditor until some weeks after the fire.

21. Scales and Hewgley described the destroyed wooden bin for an investigating agent of the defendant companies shortly after the fire.

22. After the fire, Scales obtained the services of Ernest Prosser, a contractor, to estimate the cost of rebuilding the damaged portions of the buildings. Scales, Hewgley and an adjuster for the defendants went over the plant with him. In estimating the wooden grain bin he used dimensions supplied by Hewgley in Scales's presence, but he indicated his dissatisfaction with the basis both in his estimate and on the witness stand.

23. The dimensions represented to Prosser were 20 feet by 52 feet by 30 feet. He indicated he took this to mean 20 feet wide by 52 feet long by 30 feet high. The correct dimensions were 16 feet wide by 30 feet long by 17½ high.

24. On September 6, 1956, Mrs. Helen Corinne Scales Trice, Scales's daughter,

who was closely associated in his business activities, delivered to the General Adjustment Bureau, agent for all the defendants, a document designated as a proof of loss under all the policies involved in this lawsuit and two others. This document was signed by Scales so far as the claim was against the defendants in the present case and by Hewgley so far as the claim was against a company whose grain policy is not involved here. The document was not sworn to as required by the policies, and after objection on this score Hewgley and Scales filed an amendment verifying the entire document under oath. The companies treated this document as having been filed as of the date of the verification and it will be referred to as a proof of loss hereafter without qualification.

25. The proof of loss claimed the policy limits on all policies applicable to the buildings that were burned and their contents. In two places the dimensions of the wooden grain bin were listed as 20 feet by 52 feet by 30 feet without specifying which of the dimensions was width, which length or which height. The grain claim purported to be based upon a continuing inventory with credit for salvage. In the recapitulation the destroyed or damaged grain was listed in amounts totaling 17,960 bushels, and other commodities measured only by weight in amounts totaling about 57 tons. Credit was given for 121,610 pounds of salvaged grain. No salvage was listed for the other 57 tons of commodities, some of which would not burn, and no other accounting for it has since been made so far as this record shows. The claim for grain listed 644,512 pounds of shelled corn alone, which should have left a residue of 386,000 pounds even if every grain of it had been subjected to 2,000 degrees of temperature with plenty of oxygen for the two hours the wooden grain bin stood before collapsing, which is a laboratory ideal not likely to have been reproduced.

26. In the latter part of January, 1957, Scales was questioned under oath by counsel for the defendants in accordance with their rights as reserved under the policies. He again vouched under oath for every item in the proof of loss, although stating that he relied upon books kept by Buford Hill for the grain figures. He refused to answer questions, on advice of his attorney, concerning his previous fire record. [The transcript of his evasive testimony was introduced in full by stipulation, but the record does not disclose that the jury read or heard any parts other than those mentioned, and the other parts are not here considered.]

27. Those in a position to testify directly as to the acts of arson and procurement of arson kept their secrets well until Scales died in April, 1959. Arthur Watts was questioned in 1957 as a suspect, but he denied any knowledge of it, and nothing further developed at that time. During the year after Scales died, however, some of these witnesses became involved in litigation with Mrs. Trice, his executrix, on various claims by and against the estate. Whether these actions destroyed the good will that had protected Scales in his lifetime or whether it was a coincidence, it was less than a year before rumors became more definite and led to a new investigation that produced a great deal of the conflicting portions of the evidence in this case.

The above findings are based entirely upon evidence presented to the jury without any request for limiting instructions. Furthermore, the findings reflect very cautious treatment of hearsay evidence even where introduced without objection, and serious conflicts were resolved in the plaintiff's favor unless the preponderance was clearly the other way. However, the findings also reflect the court's judgment on the credibility of witnesses to some extent. The question then arises how these findings must be altered to give due allowance to the jury's prerogative for judging which testimony to believe and which to disbelieve.

The jury could not have been so capricious as to believe Nelson's testimony on the stand, and it was precluded from accepting the reading of his prior deposi-

tion during his examination as substantive proof. Nelson's testimony, therefore, must be disregarded for present purposes. This does not mean, however, that the uncontradicted evidence of his prior confessions and denials must be disregarded. His oath obviously gives no guaranty of veracity either way, and his mental capacity and difficulty of expressing himself accurately even when he apparently desired to tell the truth throws doubt on many details of his statements. Yet the circumstances under which his various out-of-court statements were made provide strong evidence from which to draw inferences as to the probability that he set the fire at Scales's request. Each of his numerous confessions, considered separately, was made under circumstances tending to indicate their truth, at least to the extent that he had guilty knowledge of the origin of the fire. His two out-of-court repudiations of his confessions were made under circumstances tending at least to throw doubt upon the validity of the repudiation.

Certainly Nelson's accusation that D. C. Lee, one of the defendants' attorneys, obtained the first wire-recorded confession by trickery was absolutely refuted. In a statement given to Mrs. Trice and her counsel under questionable circumstances, Nelson described the recording session this way:

"In a few minutes he came back with some kind of a machine in a case. He opened it up and after he had punched some buttons around and had got it fixed, he started asking me questions. He started telling me what he wanted me to say and would ask me to repeat it. When I did he would turn the machine on. Then he would go to something else and have me repeat that and when I did he would turn the machine on to take it down. Mr. Lee made up the whole story * * *."

This is clearly a complete fabrication. First, the time Lee was shown to have been with Nelson in private was only fifteen or twenty minutes, during which he set up his machine and recorded about ten minutes of questions and answers. Assuming perfect stage management and no mistakes in timing this could not have been done in that time with the aid of an expert sound engineer using professional equipment if any appreciable number of questions or answers had to be repeated. It is absurd to suggest that a lawyer using a crotchety old hand-me-down wire recorder could stage-manage, interrogate and manipulate the recorder as charged successfully even in a matter of hours.

Second, it was shown that the recorder used could not be turned off and on without producing an audible, peculiar popping noise at the point of shutoff. No such noise can be heard on the tape except at the point the machine was cut off while Lee went to get Thomas Dunlap to witness the third interrogation. It is apparent that Lee did not even take the chance of turning the machine off between the first and second times he had James tell his story. Such additional pops as could be heard were obviously microphone or room noises that largely occurred at points where the recorder could not have been stopped without cutting a word short.

Third, Lee's and Nelson's voices too often overlap to have been managed as charged.

Fourth, Nelson obviously was of too slow a mentality to have learned his story so well in fifteen or twenty minutes of confusing intermittent instruction and recording to have been able to repeat it with variations immediately afterward with an additional witness, and to have withstood vigorous cross-examination by skilled and experienced attorneys two weeks later.

Finally, Nelson himself repudiated the accusation the day after he made it in a private, voluntary statement to Jones Boyd and subsequently to others. He re-adopted the accusation in internally conflicting and patently perjured testimony on this trial.

Considered together, all of Nelson's actions and statements prior to the trial

are almost conclusive on reasonable minds that Nelson took part in setting fire to the mill, and it needs only slight corroboration to be utterly convincing that Scales hired him to do it. Such corroboration is abundant, not only in those portions of R. C. Jones's story that are additionally corroborated by Mrs. Jones, but by the massive uncontradicted circumstantial evidence against Scales. Jones, of course, was seriously discredited by the nature of his own testimony, and by his admitted hostility to Mrs. Trice, and by the obviously good reasons he had for that hostility. Nevertheless, the implication of his testimony in the context of this case is that such lying as he may have been doing was designed to minimize his admission of complicity in arson rather than to assume a criminal accomplice's role which he did not play, and that his hostility to Mrs. Trice brought out partial truth, not fabrication.

In rebuttal, the plaintiff offered an impressive array of undependable witnesses:

Lewis E. Hewgley, who stands convicted on this record of the same lies and fraud of which Scales was guilty.

Arthur Watts, whose stout and unbroken denial of guilt barely served to keep his name out of the above findings of fact as an arsonist for failure of the hearsay declarations of an illiterate farm hand to meet the defendants' burden of proof.

Mrs. Jones Boyd, whose rehearsed testimony and evasive answers did little to rebut the defendants' case even if all the facts she alleged be taken as true.

Roy McCree, who was so deaf it was not always certain he understood the questions he answered in court, much less the out-of-court conversations he claimed to have heard.

Jack Cole, who was clearly shown to have been lying under oath as to the principal subjects of his testimony either in this court or another.

Oakley Trice, Mrs. Trice's husband, whose testimony oddly conflicted with that of Mr. and Mrs. Jones only on whether he or Scales originated a certain telephone call and whether Scales was at his home or at the Joneses'—the content of the conversation being essentially similar by either version.

Even if the arson issue had to be decided only on the basis of Jones's testimony in court and Nelson's established out-of-court statements versus the plaintiff's rebuttal witnesses, a jury verdict for the defendants would have been fully supported. Yet all of this could be set to one side and there would still remain a massive circumstantial case against Scales. Only findings of fact numbered 5, 8, 9, 12 and 13 would be eliminated, and No. 7 would be modified to delete reference to the unseasonal nature of the hay operation. If, in addition, the jury were so unreasonable as to accept Hewgley's denial of his visit to McKnight against the testimony of two unimpeached witnesses, Hewgley's identity would be deleted from No. 10. The other twenty findings were established by admissions and stipulations, by the plaintiff's own witnesses, or by uncontradicted testimony of unimpeached defense witnesses.

And finally there stands the legal presumption against the plaintiff arising from her unexplained failure to present certain witnesses shown to have been in position to testify to facts in her favor if such facts existed—herself; Buford Hill, the bookkeeper on whom her father said he relied for the grain inventory; James Gable, a regular employee at the mill; and her mother and brother, who should have been able to throw some light on Scales's movements on the morning and afternoon before the fire.

By any analysis associated with logic, the verdict of the jury was contrary to the great preponderance of the evidence, and it must therefore be set aside and a new trial granted on the issue of arson.

### E. Conduct of Counsel

The defendants allege as ground for a new trial the conduct of the plaintiff's counsel before and during the trial. There can be no doubt that the record shows the plaintiff's counsel in an un-

favorable light. But a motion for a new trial is not the proper occasion for placing a member of the bar of this court on trial. His conduct should be discussed here only to the extent that it is alleged to have prejudiced the defendants or deprived them of a fair trial.

Without reviewing the evidence in detail, the court finds that:

1. Mrs. Trice and her counsel improperly took a sworn statement from James Nelson in an *ex parte* interview during a recess in the taking of Nelson's deposition in which Nelson repudiated the testimony given on the deposition.

2. Thereafter the plaintiff's counsel approached defense counsel about resumption of Nelson's cross-examination pursuant to his reservation without disclosing to them that Nelson had changed his testimony.

3. Before taking the statement they informed Nelson that he had been indicted for arson in the burning of the mill and conveyed to him the understanding that his confession previously given could be used against him in the prosecution on the indictment.

4. The statement obtained from Nelson was almost certainly false in its overall import and was unquestionably false insofar as it charged that D. C. Lee made up Nelson's prior confession story and obtained a recording of it by trickery.

5. The witness subsequently perjured himself in this court in the course of testifying in support of the statement improperly obtained by Mrs. Trice and her counsel.

6. The plaintiff's counsel presented Jack Cole as a rebuttal witness for the very purpose of testifying to the truth of matters the plaintiff's counsel knew or should have known the witness had previously testified in a related trial were not true.

This conduct was improper, whether knowingly so or not, and in view of the very strong case of arson made out by the defendants by other evidence, the court cannot say that the results of this improper conduct did not gain his client an unfair advantage that resulted in the jury's verdict against the defendants on the arson defense.

Accordingly, prejudice has clearly been shown. The verdict must therefore be set aside and a new trial granted on the issues of arson and the good or bad faith of the plaintiff.

It will not be necessary to discuss here the other allegations relating to the conduct of the plaintiff's counsel on the trial, but the court deems it pertinent to discuss in this context a matter brought up by plaintiff's counsel in one of his post-trial briefs.

In his "Reply Brief on Behalf of Plaintiff, Grounds 1, 2, 3, 4, 14 and 15 of Defendants' Motion for Judgment Notwithstanding the Verdict and in the Alternative for a New Trial" filed December 10, 1962, counsel stated at page 18:

"In neither of the three versions of Lee and Nelson on the wire recorder was there a description of the car Nelson rode to town in after Jones had transferred him over on the Wales Road."

At page 10 of the official court reporter's transcript of the wire-recorded interviews appears the following exchange:

"Q What kind of car did he have?

"A Some kind of yellowish-looking, cloth top Chevrolet, I believe. Yellow. Convertible, I believe."

The court had the recording, Defendant's Exhibit 15 for Identification, replayed in chambers to confirm this transcript. This confirmed that Nelson was the first to provide the description of the car that plaintiff's counsel suggests defense counsel put in his mouth at a later date.

In the course of this replaying, the court and the reporter discovered that the "yellow" description also appeared later on the wire recording but was not transcribed through error. At page 12 of the transcript the reporter originally transcribed an exchange between Dunlap and Nelson as follows:

"Q You were in his car?

"A In this other man's car.

694

"Q Did he have a cloth-topped car?

"(No distinguishable answer.)"

The replaying disclosed that this exchange actually was as follows:

"Q You were in his car?

"A In this other man's car.

"Q A yellow cloth-topped car?

"A Yes, sir."

The transcript will be so corrected before it is filed as a part of the record in the case.

The plaintiff's counsel, of course, may not be charged with knowledge of Mr. Dunlap's question about the "yellow cloth-topped car," but there is no excuse for his failure to discover the description given by Nelson himself before falsely accusing defense counsel of inventing the description at a later time.

### F. Conduct of Juror

 Immediately after the jury rendered its verdict in this case and was discharged, Mrs. Lucille S. Hardison, one of the jurors, and Mrs. Roy Arney, sister of plaintiff and daughter of Joe W. Scales, embraced each other in full view of the court and all spectators. This conduct was cited by defendants as one of their grounds for a new trial but nothing further was said about it by brief or in oral argument on the first hearing. The court was of the opinion that the question should be disposed of and an additional hearing was therefore ordered.

At the conclusion of the additional hearing, the court was of the opinion and stated that the defendants had failed to establish that the jury's verdict had been influenced by any misconduct on the part of the juror. See Palmer v. Miller, 60 F.Supp. 710 (D.Mo.1945).

A new trial, therefore, cannot be granted on the basis of this ground of the motion.

### IV

#### The Counterclaims

The disposition to be made of the defendants' motion for judgment notwithstanding the verdict raises further questions as to the disposition of the defendants' counterclaims, which would have been pretermitted if the jury's verdict had been sustained. As indicated earlier, the claim for the statutory penalty for bad faith litigation, alternatively stated in the first and second counts of the counterclaim, is undoubtedly good, but the question of the proper manner for determination of the amount of the penalty is a difficult one. The third and fourth counts of the counterclaims, seeking judgment over against the Scales estate for amounts the defendants might be required to pay the mortgagees likewise present a difficult question in view of the out-of-court settlement on the payment to the mortgagees.

The case must therefore be set down for further hearing on these questions before a final judgment can be entered.

### V

#### Summary

In summary, the court holds:

1. The plaintiff's motion for relief from a portion of the amended judgment previously entered must be dismissed as untimely.

2. The plaintiff's notice of appeal is ineffective to divest the court of jurisdiction to dispose of the issues before it.

3. The defendants' motion for judgment notwithstanding the verdict is well taken on the ground that Scales was shown to have been guilty of fraud, false swearing, and willful misrepresentation as a matter of law, but it is not well taken on other grounds.

4. The defendants' motion for new trial is well taken on the grounds that the verdict was contrary to the great preponderance of the evidence on the issues of arson, fraud, false swearing, and willful concealment or misrepresentation, and on the ground that the improper conduct of the plaintiff's counsel deprived the defendants of a fair trial of the arson issue, but it is not well taken on the other grounds.

5. The defendants' counterclaims under these holdings raise questions that require further hearing.

Accordingly, an interlocutory order will be entered setting aside the verdict insofar as it finds that Scales did not burn this mill or cause it to be burned and insofar as it finds that Scales was not guilty of fraud, false swearing or willful concealment or misrepresentation of material matters as against these defendants and setting aside the judgment heretofore entered against these defendants. No new judgment will be entered, however, pending determination of the questions raised by the counterclaims.

## SUPPLEMENTAL MEMORANDUM AND ORDER

By a memorandum and interlocutory order pursuant thereto which were entered December 20, 1962, the court disposed of all issues on the defendants' motions under Rule 50(b), Federal Rules of Civil Procedure, except the problem of the proper disposition of the defendants' counterclaims under the court's holding that they were entitled to judgment notwithstanding the verdict.

A further hearing was ordered on the counterclaims problem for January 7, 1963. Counsel representing all the remaining parties appeared and presented arguments at that time. The defendants also presented at the hearing two motions for summary judgment on the counterclaims incorporating their contentions as to the proper disposition of the counterclaims. One of these was supported by brief. Counsel for the substituted plaintiff, Helen Corinne Scales Trice, Executrix of the Will of Joe W. Scales, deceased, requested time in which to file a brief in opposition to the motions. The court granted him ten days and gave the defendants an additional five days in which to reply to any new matter that might be raised by the plaintiff's brief. The plaintiff filed two briefs on the tenth day, January 17, 1963, one in opposition to each of the defendants' motions. Two days later, on January 19, 1963, Mrs. Trice's counsel presented the following papers to the clerk for filing: (1) the plaintiff's affidavit alleging personal bias and prejudice of the judge against her and in favor of the defendants, with attached exhibit and counsel's certificates of good faith and of service; and (2) a notice of appeal from the court's interlocutory order of December 20, 1962, with accompanying bond. He asked the clerk to file the affidavit first.

The questions now before the court, then, are these:

(1) Is Mrs. Trice's affidavit of bias effective, under 28 U.S.C. § 144, to prevent the court from disposing of the issues already submitted to it for decision?

(2) Does her notice of appeal of January 19, 1963, divest the court of further jurisdiction?

(3) Is a further hearing required on the defendants' motions for summary judgment?

(4) What disposition should be made of the counterclaims in the judgment notwithstanding the verdict to which the court held the defendants entitled on December 20, 1962?

These questions will be considered in the order stated, since an affirmative answer to any one of the first three would dispense with the necessity for considering any question subsequent to it.

### I. *The Affidavit of Bias*

The court has a duty to determine whether the affidavit of bias, accepting the facts alleged as true, meets the requirements of the statute, Albert v. U. S. District Court for Western District Mich., 283 F.2d 61, 62 (6th Cir., 1960), and to withdraw or proceed with the case in accordance with its determination of that purely legal question, Simmons v. United States, 302 F.2d 71, 75 (3rd Cir., 1962); Johnson v. United States, 35 F.2d 355, 356 (D.W.D.Wash. 1929), although a judge, in the exercise of his discretion, may disqualify himself notwithstanding insufficiency of the affidavit either for the sake of appearances, United States v. Quattrone, 149 F.Supp. 240 (D.D.C.1957), or because the judge doubts his own impartiality, Saunders v. Piggly Wiggly Corp., 1 F.2d 582 (D.W.D.Tenn.1924).

The statute [1] requires that the affidavit be both timely and sufficient. To be timely, the affidavit must "be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time." To be sufficient it must state the facts and reasons on which the belief is based, and these facts, taken as true, must be legally sufficient to show bias personal to the judge.

This affidavit, the text of which is set out in full in the footnote,[2] fails to meet any of these requirements.

First, it is untimely. In one of the first cases to arise under the statute after it was first enacted, Ex Parte

1. "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

"The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

2. "The plaintiff, Helen Corinne Scales Trice, Executrix under the Will of Joe W. Scales, of lawful age makes oath as follows:

"That Frank Gray, Jr., the judge before whom this case is pending has a personal bias or prejudice against her and in favor of the defendant insurance companies. The facts and reasons for her belief that such bias or prejudice exists are disclosed by the court reporter's transcript of the hearing in Nashville, January 7, 1963, excerpts from which are attached to this affidavit and made a part hereof and marked Exhibit 'A' hereto, the Memorandum of Agreement between Thurman Smith, individually and Trustee, and The Union Bank of Pulaski, and the defendant insurance companies and the proceedings on May 18, 1962 and orders made subsequent thereto.

"In the matter of the settlement agreement, the interests of both the mortgagee-plaintiffs, Thurman Smith, Trustee, and individually, and The Union Bank, and the defendant insurance companies were adverse to her interests. Nevertheless, the judge, according to his admission at the hearing on January 7, 1963, at an out-of-court conference in his chambers with attorneys for said adverse parties during the trial without the plaintiff or her attorney being present took part in the drawing up of a settlement agreement which on its face and the record adversely affects the rights and interests of this plaintiff. And now, the defendant insurance companies are seeking to have said agreement applied, in part at least, as the basis of a judgment against her. Affiant says that she is advised by her attorney that the judge is disqualified from interpreting, applying, enforcing, or in any way passing on the rights acquired by the defendant insurance companies against her as the result of said agreement which the judge had a hand in making, in the manner established by the hearing on January 7, 1963."

The text of Exhibit "A" follows:

"MR. HENRY: What page are you reading from?

"MR. FARMER: Page 22 in its memorandum. The court in its memorandum said defendants further allege that the court should not have submitted the question of value of building items to the jury because the defendants had already settled this issue by agreement with the mortgagee plaintiffs. The contention is sound but it is difficult to see how the defendants were or could've been prejudiced by the court's oversight in submitting the issue after indicating its intention not to do so.

"And at another place in the court's memorandum the court says that the plaintiff is making a bald effort to require the defendants to pay double on a single liability. That it shocks the conscience of the court and that this motion was not made in good faith.

"If the court please we feel compelled to make an issue as to this statement, these statements by the court in its memorandum as being we think not entirely correct. We think it was not through oversight on the part of the court that this issue was submitted to the jury.

"Now in the first place, what the court refers to as an agreed order of dismissal was not agreed to by the plaintiff, Mrs. Trice. She had nothing to do with that. After the evidence was concluded on May

American Steel Barrel Co., 230 U.S. 35, 33 S.Ct. 1007, 1010, 57 L.Ed. 1379 (1913), the Supreme Court of the United States said:

"Neither was it intended to paralyze the action of a judge who has heard the case, or a question in it, by the interposition of a motion to disqualify him between a hearing and a determination of the matter heard. This is the plain meaning of the requirement that the affidavit shall be

17th, on the following morning the court before the jury returned stated that he had been advised by Mr. Sims yesterday afternoon that a settlement had been reached and that the mortgagee plaintiffs were dismissing with prejudice their claims against the defendants. Then when the jury was called in the court told the jury at the outset before there was any argument or anything that the settlement had been reached, the claims of the mortgagees—, I haven't got the record right here before me, I couldn't turn to that right now; but that that was withdrawn from their consideration.

"MR. HENRY: If Your Honor please, pardon me, Mr. Farmer. If the court please, Mr. Farmer is not addressing himself to the matter under discussion.

"MR. FARMER: I think I am.

"THE COURT: Well, I'm going to let him go on anyhow. Go ahead, Mr. Farmer.

"MR. FARMER: The court in his instructions to the jury specifically told the jury that the issue raised by the mortgagee plaintiffs had been withdrawn from their consideration. The question of liability of the insurance companies to the plaintiff, Mrs. Trice, Executrix, on all of the policies, was submitted to the jury. Amount of damages was submitted. And these forms of special verdicts. After these specific statements had been made without any objection on the part of the defendant insurance companies. And then the jury returned verdicts on these issues.

"Now, if the court please, these instructions under the law became the law of the case and the defendants are estopped to insist that there was error in submission of the issue of liability to the estate of Joe W. Scales.

"If the court please, in order to get the facts, I request that counsel make the following stipulation to get the facts in the record.

"In a discovery deposition of Mr. Cecil Sims which I took on November 8, 1962 in a case which is an aftermath of this case pending in the Chancery Court of Giles County, Helen Corinne Scales Trice, Executrix versus The Union Bank, No. 1710; on Thursday, November 8, 1962; Mr. Sims testifying under oath testified as follows; I will see if counsel stipulate that these are the facts with regard to this settlement agreement. I asked this question. I will let counsel see this when I finish reading it; it was taken down by Mr. Hamlin.

" 'Question: Referring now to this settlement contract, between the insurance companies and Thurman Smith, Trustee and the Union Bank, question, but it is not dated, bears no date?

" 'Answer: This is Mr. Sims' answer. It doesn't appear to have a date on the contract itself but it was dictated in the Clerk's Office in the federal court building at Columbia, while the case was in the course of trial and nearer the end of the case because the federal judge called the lawyers in and suggested they better settle with me and they did so.

" 'Question: Called what lawyers in?

" 'Answer: He called in Mr. Malcolm Marshall who was there from Louisville, Kentucky representing the insurance companies, and Mr. Marshall and I talked to the judge. Mr. Lon MacFarland signed the settlement agreement. I think he was in and out but the agreement was actually made between Mr. Malcolm Marshall and myself with the judge more or less presiding over the agreement.

" 'Question: He presided over the agreement?

" 'Answer: Well, he said—

" 'Question: Do you mean that?

" 'Answer: Well, yes, I mean that. He called Mr. Marshall in according to what Mr. Marshall told me and what the judge confirmed and said, Have you made any efforts to settle with Mr. Sims and he said that he had but they hadn't succeeded. He said, Well, I would suggest that you all better get together and we did get together. We had a conference with the judge and he said that in substance and Mr. Marshall made me an offer in the presence of the judge which I declined because it did not include interest and then I pointed out to him that I was entitled to interest as a matter of law I thought and then he added interest to it and we worked out the settlement. I think it was all worked out the main part in the presence of the judge. But then when we went to draw

filed not less than ten days before the beginning of the term."

And the Sixth Circuit Court of Appeals has more recently interpreted the statute as applying only before trial. Knapp v. Kinsey, 235 F.2d 129 (6th Cir., 1956). In that case, the court said, 235 F.2d at 131:

"In our opinion, Section 144, Title 28, U.S.Code was not applicable to this case in which the claimed bias or prejudice was first disclosed during the trial. Under the circumstances the remedy can not be by a change of judges during the trial; it necessarily becomes a matter of

alleged prejudicial error and for correction by the Court of Appeals. Moskun v. United States, 6 Cir., 143 F.2d 129; United States v. Flegenheimer, D.C.N.J., 14 F.Supp. 584, 591."

Even if it be assumed, *arguendo*, that the statute might sometimes apply to proceedings after trial, this affidavit would still be too late. The affidavit and exhibit thereto show that the alleged facts on which the plaintiff relies to show bias occurred May 17, 1962, or earlier, that she had full knowledge of them no later than November 8, 1962, and that the so-called "admission" by the judge in rela-

it Mr. Marshall went back somewhere else and drew it and I didn't agree with his draft of it and I took it and re-dictated it and I think I actually wrote the settlement agreement and then Mr. Marshall agreed to it and Mr. MacFarland, they both signed it and I signed it and we carried it out and the court approved it.

"Could we stipulate that those are the facts how that settlement agreement was worked out?

"THE COURT: Are you asking counsel over at the table? I don't think they knew anything about it, do you, Mr. MacFarland?

"MR. MacFARLAND: I was not there. I think I signed the agreement and that agreement was filed with the court, but I was not present; nothing that he has read about it that I have any knowledge of it.

"MR. FARMER: Would the court say whether that is correct about it or not?

"THE COURT: No, sir, I won't make any statement about it at all, Mr. Farmer. I state that is Mr. Sims' recollection of what occurred.

"MR. FARMER: But the court will not make any statement?

"THE COURT: No. I will state that they discussed settlement in front of me.

"MR. FARMER: I was not present at that time.

"THE COURT: No, you weren't present. The settlement was not between your client and anyone. It was between Mr. Sims' client and the defendant insurance companies.

"MR. FARMER: Well, our position, if the court please, in short is, as I have set forth in briefs filed before Your Honor, that the defendants—, that there was no oversight. That there was no

oversight on the court's part in submitting the issue of liability to the Scales Estate. That this was deliberate on the part of the insurance companies. They asked for penalty from the jury that they were entitled to recover penalty from the Scales Estate. That issue was submitted to the jury and that they gambled and lost. And it is beyond the—, they are estopped to raise any question or to complain about the submission of the issue.

"That the court's instructions unexcepted to become the law of the case and that it is beyond the power and jurisdiction of the court now to entertain this—, undertake to set aside this jury verdict and render a judgment in favor or any judgment in favor of the defendants.

"MR. MacFARLAND: May it please the court, in my opinion listening to Mr. Farmer he did not address himself to the questions which the court raised. I have discussed our right to or the penalty under counts one and two of the counterclaim. With the court's permission I would now like to make a statement in regard to our rights under the counterclaim which I understand is the issue presented here.

"THE COURT: Let me raise one question, Mr. MacFarland. You have stated with reference to the counts one and two, statutory penalty matter, that there is some doubt in your mind as to whether the court has the authority to fix the amount of the penalty."

The text of counsel's certificate follows:

"I, Fyke Farmer, counsel for the plaintiff, Helen Corinne Scales Trice, Executrix under the Will of Joe W. Scales, hereby certify that the affidavit of bias is filed in good faith. This January *19*, 1963."

tion to them was made on January 7, 1963. Yet she waited until January 19, 1963, eight months after the settlement agreement complained of, two months after she had knowledge of all the essential facts, twelve days after the so-called admission by the judge, and two days after she had submitted her final brief on the matters before the court before she submitted her affidavit—and she makes no attempt to show any cause, good or otherwise, for her failure to file it earlier. This does not meet the standard of diligence required by the courts for filing of affidavits of bias even in cases where late filing might otherwise have been acceptable. See, e. g., Hibdon v. United States, 213 F.2d 869 (6th Cir., 1954); Refior v. Lansing Drop Forge Co., 124 F.2d 440, 444 (6th Cir., 1942) cert. denied 316 U.S. 671, 62 S.Ct. 1047, 86 L.Ed. 1746 (1942); Scott v. Beams, 122 F.2d 777, 788–789 (10th Cir., 1941) cert. denied 315 U.S. 809, 62 S.Ct. 794, 86 L.Ed. 1208 (1942); Tennessee Pub. Co. v. Carpenter, 100 F.2d 728, 734 (6th Cir., 1938) cert. denied 306 U.S. 659, 59 S.Ct. 775, 83 L.Ed. 1056 (1939); Bommarito v. United States, 61 F.2d 355, 356 (8th Cir., 1932).

■ Even if it were timely, this affidavit fails to disclose facts from which it may be reasonably deduced that there was any bias or prejudice, personal or otherwise. The affidavit, construed most favorably to the affiant's contentions, shows that the court suggested to one of the lawyers for the defendants that he should discuss settlement with the affiant's co-plaintiffs, that such a discussion was held in part in the presence of the judge in chambers in the absence of (but not necessarily without the knowledge of) the affiant or her counsel, that a settlement was reached resulting in the affiant's co-plaintiffs taking a nonsuit with prejudice with the approval of the court, that the agreement was announced in open court before the case was submitted to the jury, that the jury was instructed that the issues between the defendants and the co-plaintiffs had been removed from its consideration, that

the court indicated its intention not to submit the issue of building item damages to the jury because this issue had been settled by the agreement, that it nevertheless submitted this issue, that the defendants subsequently complained of it and the court expressed the opinion that the defendants had not been prejudiced thereby, that the affiant's interests are adverse to those of her co-plaintiffs but that the court did not consider them so, and that the judge declined to confirm that he "presided" over the negotiations mentioned. These facts do not support the affiant's conclusion that the court acted from bias or prejudice. This is true even without aid of the natural inferences to be drawn from the court's refusal to confirm that he "presided" over the negotiations and from the affiant's glaring failure to allege that she and her counsel were without contemporary knowledge of the fact that counsel for her co-plaintiffs was negotiating with the defendants in chambers.

■ The negotiations are shown by the affidavit to have been made at arm's length between counsel diligently representing the interests of parties adverse to each other on issues the court did not believe affected the affiant's interests. Even ex parte conferences with counsel for one party would not necessarily indicate bias. United States v. Onan, 190 F.2d 1 (8th Cir. 1951) cert. denied 342 U.S. 869, 72 S.Ct. 112, 96 L.Ed. 654 (1951); Craven v. United States, 22 F.2d 605, 607 (1st Cir., 1927) cert. denied 276 U.S. 627, 48 S.Ct. 321, 72 L.Ed. 739 (1928); United States v. Valenti, 120 F. Supp. 80 (D.N.J.1954).

At the very most, the facts alleged disclose a possible error of judgment in the court's opinion that the affiant's interests were not affected by the negotiations so as to require her presence or that of her counsel. And if the affiant's invitation in her affidavit that the agreement and record be referred to in amplification of the facts contained in the affidavit, it will be affirmatively shown that her legitimate interests were not, in fact, affected adversely by the agreement finally

reached, that the agreement provided for payment only of sums her own complaint alleged were due to the mortgagee-plaintiffs, and that every action contemplated in the settlement agreement was affirmatively authorized by the insurance contracts on which her cause of action rests. If the record may be referred to generally to amplify the affidavit, as the affidavit itself suggests, it will also be disclosed that the defendants are not seeking, as alleged, to have this agreement applied against her by this court. If the agreement is to have any effect on the issues now before the court, it can be only to the plaintiff's advantage by requiring the dismissal of certain counts of the defendants' counterclaims against her.

■ Even if some implication of bias or prejudice could be found in all of this, it is clear that it is not an implication of *personal* bias. Unless the bias is personal to the judge, it is not a basis for invocation of the statute. Williams v. Kent, 216 F.2d 342 (6th Cir., 1954).

■ The affidavit being totally ineffective to invoke the statute,[3] it remains to consider whether anything makes it advisable for the court to withdraw in the exercise of its discretion without rendering its decision on the matters already submitted to it. This requires the judge accused of bias and prejudice to examine his conscience, honestly and carefully, to determine if he has any bias or prejudice against or in favor of any of the litigants. Having done so, the court is aware of no actual bias for or against any party to the case unless its belief in the correctness of decisions heretofore made for and against all the parties on various issues on the basis of the facts and the law presented for its adjudication constitutes a bias.

■ If that were a bias requiring withdrawal of a judge, no case could be litigated to a conclusion before a single judge. Further, the court is aware of

no facts upon which any reasonable suspicion could be founded that it has any bias—any "bent of mind that may prevent or impede impartiality of judgment," Berger v. United States, 255 U.S. 22, 33–34, 41 S.Ct. 230, 233, 65 L.Ed. 481 (1921). Therefore, there is no reason for withdrawing to preserve public confidence in the impartiality of the federal courts.

■ Finally, it is not now practical to withdraw. Nothing remains but to decide issues already adequately presented. The affidavit, if effective at all, could not have retroactive effect on decisions already made. Spampinato v. M. Breger & Co., 270 F.2d 46, 48 (2nd Cir., 1959) cert. denied 361 U.S. 944, 80 S.Ct. 409, 4 L.Ed.2d 363 (1960), rehearing denied 361 U.S. 973, 80 S.Ct. 597, 4 L. Ed.2d 553 (1960). Only a showing of actual bias or some other matter constituting prejudicial error could now avail to restore the verdict and judgment in favor of the plaintiff. Delays necessarily incident to resubmission to another judge of the matters already heard by this court would serve only to delay the final judgment that must be entered before such errors could be presented to the Court of Appeals for proper correction. See Knapp v. Kinsey, 232 F.2d 458 (6th Cir., 1956), rehearing denied 235 F.2d 129 (6 Cir., 1956).

The affidavit of bias will be stricken and the court will proceed to a final decision of the matters remaining before it or which may come before it in this cause.

II. *The Notice of Appeal*

■ The effect of the notice of appeal of January 19, 1963, requires little discussion. All of the principles that led the court to conclude that the notice of appeal filed November 7, 1962, was ineffective to divest the court of jurisdiction to dispose of matters before it apply with even greater force in connection with the new notice. The order attempted to be

---

3. Another possible defect in this affidavit not explored further here is the form of the attorney's certificate of good faith. See In the Matter of Union Leader Corp., 292 F.2d 381, 385 (1st Cir., 1961) cert. denied 368 U.S. 927, 82 S.Ct. 361, 7 L. Ed.2d 190 (1961).

appealed from is explicitly and implicitly interlocutory and therefore not appealable. See the cases cited on this point in the memorandum of December 20, 1962.

The court is satisfied that its jurisdiction has not been impaired by either of the notices of appeal filed so far.

### III. *The Motions for Summary Judgment*

 The issues presented by the motions for summary judgment were already before the court in full on the motions for, directed verdict at the close of all the evidence as renewed by the motions for judgment notwithstanding the verdict. Even if the motions for summary judgment could be considered at this late date, therefore, the issues are more properly before the court on the motions for judgment notwithstanding the verdict. See Equitable Life Assurance Society of United States v. Gillan, 70 F.Supp. 640, 644 (D.Neb.1945). The defendants' motions for summary judgment will therefore be dismissed without prejudice to the consideration herein of the same issues as presented by the motions for judgment notwithstanding the verdict.

### IV. *The Counterclaims*

Because of differences in the relationships of the original parties, no longer pertinent here, the present defendants submitted two separate answers and counterclaims, one for four of them and the other for three, and the counterclaims were separately amended. So far as the present issues are concerned, however, they are identical, and for grammatical simplicity they will be treated as a single answer and counterclaim herein.

The original counterclaim, which is count one of the amended counterclaim, sought recovery of the statutory penalty for bad faith litigation under T.C.A. § 56–1106, which provides:

"In the event it shall be made to appear to the court or jury trying the cause that the action of said policyholder in bringing said suit was not in good faith, and recovery under said policy shall not be had, said policyholder shall be liable to such insurance company, corporation, firm, or person in a sum not exceeding twenty-five per cent (25%) of the amount of the loss claimed under said policy; provided, that such liability, within the limits prescribed, shall, in the discretion of the court or jury trying the cause, be measured by the additional expense, loss, or injury inflicted upon the defendant by reason of said suit."

Counts two, three and four were added by amendment after Mrs. Trice was substituted for her deceased father as party plaintiff.

Count two merely expanded the evidentiary allegations in support of the same claim presented by count one.

Count three sought judgment over against Mrs. Trice "for all amounts, if any, for which these defendants or any of them are adjudged liable in this action" to any of the mortgagee-plaintiffs. This appears to be grounded on the general equitable principle that losses should be borne by those whose wrongs occasion the losses.

Count four sought recovery over, by contract subrogation, against Mrs. Trice if any of the defendants "should be adjudged liable to any extent to any plaintiff or plaintiffs herein under the provisions" of their policies.

Inasmuch as the issues between these defendants and the mortgagee-plaintiffs were compromised and settled before the motion for directed verdict was submitted, and the complaint was dismissed with prejudice so far as the claims of the mortgagee-plaintiffs were concerned before the case was submitted to the jury, the liability of the defendants to the mortgagee-plaintiffs has never been "adjudged." Therefore, there is no basis for rendering a judgment over, and counts three and four must be dismissed. The dismissal, however, will be without prejudice to any rights that may accrue or may have accrued to the defendants upon payment to the mortgagees under the agreement or otherwise.

702

■ This leaves the first two counts, which are merely alternative statements of the same claim. The court has already held that the attempted fraud by false swearing and willful misrepresentation of material matters requires a finding of bad faith against Scales as a matter of law. By the terms of the statute, this establishes the plaintiff's liability for the penalty. The problem remaining is how the amount of the penalty is to be determined under the present circumstances.

The statute clearly leaves the amount of the penalty, within the prescribed limit, to the uncontrolled discretion of the "court or jury trying the cause." This language ordinarily would mean the jury in a jury case and the court only where the case is tried without a jury. The legislature did not specifically provide for a situation like the present, where the finding of bad faith was made by the court as a matter of law after the trial jury had been discharged.

Such a situation does not seem to have come up in any reported case. There is some indication that the bench and bar have assumed that under this section and the reciprocal section in favor of the policyholder, T.C.A. § 56–1105, which is similarly worded,[4] a finding of bad faith by one of the parties entitles the opposite party to recover full litigation expenses up to the 25 per cent limit. In Bryan & Hewgley, Inc. v. Niagara Fire Ins. Co., Columbia Division Case No. 219 in this court (1950) (unreported), reversed in part on other grounds, Niagara Fire Ins. Co. v. Bryan & Hewgley, Inc., 195 F.2d 154 (6th Cir., 1952), involving the provision now codified as T.C.A. § 56–1105, the record discloses that the

court and both parties assumed without discussion throughout the trial that a finding of bad faith by the insurance company automatically entitled the plaintiff to the full penalty. Only the question of bad faith was submitted to the jury, and the penalty was assessed by the court, although the appellate court failed to note this point, no issue on it having been raised below or on appeal, see 195 F.2d at 156.

■ The statute makes it clear that the legislature intended that a penalty in some amount should be assessed in a case such as this. It likewise makes it clear that the legislature considered it important that the amount should be determined on consideration of the conduct of the principal lawsuit, not as an isolated issue separately tried. If the liability had been declared by the court on the motion for directed verdict in the present case, the amount would have been submitted for the jury to determine in the same way that the amount due the grain insurers was determined. But it is no longer practical to submit it to the trial jury, and a jury specially impaneled would not have the benefit of having seen and heard all the evidence upon the principal trial. This leaves the court as the only agency in position to make the legislature's primary intentions effective.

"Statutes, including penal enactments, are not inert exercises in literary composition. They are instruments of government, and in construing them 'the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down.'" United States v. Shirey, 359 U.S. 255, 260–261, 79 S.Ct. 746, 749, 3 L.Ed.2d 789

4. "The insurance companies of this state, and foreign insurance companies and other persons doing an insurance business in this state, in all cases when a loss occurs and they refuse to pay the same within sixty (60) days after a demand shall have been made by the holder of the policy on which said loss occurred, shall be liable to pay the holder of said policy, in addition to the loss and interest thereon, a sum not exceeding twenty-five per cent (25%) on the liability for said loss; pro-

vided, that it shall be made to appear to the court or jury trying the case that the refusal to pay said loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury upon the holder of said policy; and, provided, further, that such additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury thus entailed."

(1959). "[E]ffect must be given the ascertained paramount intent of the legislature 'although there exist some apparent obstacles'." Rose v. Blewett, 202 Tenn. 153, 162–163, 303 S.W.2d 709, 713 (1957). " '[T]he reason and intention of the law, when obvious, will prevail over the literal sense of the words.' " Ibid. "Of course, it is a primary rule of construction of statutes to ascertain and declare the intention of the legislative body." Interstate Commerce Commission v. Weldon, 90 F.Supp. 873, 875 (D.W.D.Tenn.1950), affirmed 188 F.2d 367 (6th Cir., 1951), certiorari denied 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 625 (1951).

Here no real violence need be done to the usual meaning of the phrase "court or jury trying the cause" to give effect to the obvious intent and policy of the legislature. For here the court has actually determined the issue that results in the finding of bad faith as a matter of law, and it is in that sense the "court * * * trying the cause" within the meaning of the statute. Under present circumstances, the court should determine the amount of the penalty, giving due consideration to all the factors mentioned in the statute.

 The maximum claim against these insurers was $50,000.00, and the maximum penalty therefore would be $12,500.00. There is no doubt that the litigation has cost these defendants more than that amount. However, the court does not consider that it would be a proper application of the statute in the circumstances of this case to award the maximum penalty. The $25,000.00 coverage on building items should not be considered because this was in actual effect an issue between the defendants and the mortgagee-plaintiffs. The court concludes that the appropriate penalty under the statute would be 25 per cent of the $25,000.00 claim for machinery and equipment, or $6,250.00.

In accordance with the views expressed in the original memorandum and this supplemental memorandum, and pursuant to the prior order entered December 20, 1962, it is now further ORDERED:

1. That the plaintiff's affidavit of bias be stricken.

2. That the court retains jurisdiction to dispose of the matters now before it in spite of the plaintiff's notice of appeal filed January 19, 1963.

3. That the defendants' motions for summary judgment be, and they are hereby, dismissed without prejudice to the determination of the issues therein under the motion for judgment notwithstanding the verdict.

4. That counts three and four of the defendants' amended counterclaims be, and they are hereby, dismissed without prejudice.

5. That notwithstanding that portion of the verdict of the jury, which has heretofore been set aside along with the judgment entered thereon, as amended, the clerk will enter judgment forthwith as follows:

"JUDGMENT is hereby entered by order of the court that the plaintiff, Helen Corinne Scales Trice, Executrix of the Will of Joe W. Scales, deceased, take nothing by her suit against the defendants, Commercial Union Assurance Company, Limited; American National Fire Insurance Company; North British and Mercantile Insurance Company, Limited; Citizens Insurance Company of New Jersey; Queen Insurance Company of America; Home Insurance Company; and New Hampshire Fire Insurance Company, and that the said defendants have and recover of the said plaintiff, Helen Corinne Scales Trice, Executrix, the sum of $6,250.00 and the costs of the cause."

6. That in the event the above judgment notwithstanding the verdict should be set aside in any subsequent proceeding, the case shall be set down for a new trial on the issues of arson, fraud, false swearing, willful concealment or misrepresentation of material matters and the good or bad faith of the plaintiff.