## UNITED STATES *v.* SHIREY.

No. 72.   Argued January 19, 1959.—Decided April 20, 1959.

*Assistant Attorney General Anderson* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Beatrice Rosenberg* and *J. F. Bishop.*

*Donn I. Cohen* argued the cause for appellee. With him on the brief was *Sidney G. Handler.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

On July 23, 1954, an information was filed in the District Court for the Middle District of Pennsylvania charging appellee with a violation of 18 U. S. C. § 214 (originally § 1 of the Act of December 11, 1926, 44 Stat. 918). That statute provides:

> "Whoever pays or offers or promises any money or thing of value, to any person, firm, or corporation

in consideration of the use or promise to use any influence to procure any appointive office or place under the United States for any person, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

The information alleged that appellee had offered S. Walter Stauffer, a member of Congress from Pennsylvania, to contribute $1,000 a year to the Republican Party in consideration of Stauffer's use of influence to procure for appellee the postmastership of York, Pennsylvania. The District Court granted a motion to dismiss for failure to state facts sufficient to constitute an offense against the United States. 168 F. Supp. 382. The Government appealed directly to this Court, 18 U. S. C. § 3731, and we noted probable jurisdiction, 358 U. S. 806, to determine whether the allegations of the information constituted a violation of 18 U. S. C. § 214.[1]

We turn first to the language of the statute. There are alternative constructions of its language. One sensible reading is to say that even though the Republican Party was to be the ultimate recipient of the money, this was a promise to Stauffer of money (which it plainly was) in consideration of his use of influence. Since Stauffer is a "person," the statute covers the alleged offense. It may be urged that although a promise was made to

---

[1] The information charges as follows:

"On or about the 5th day of December 1953, in the City of York, Middle District of Pennsylvania, and within the jurisdiction of this Court, GEORGE DONALD SHIREY, in violation of the Act of Congress, June 25, 1948, c 645, Sec. 1, 62 Stat. 694, 18 U. S. C. Sec. 214, did KNOWINGLY, WILFULLY and UNLAWFULLY offer or promise to S. WALTER STAUFFER, a Member of Congress of the 19th Congressional District of Pennsylvania, to donate $1,000 a year to the Republican Party to be used as they see fit, in consideration of the use or the promise to use any influence to procure for him the appointive office, under the United States, of Postmaster of York, Pennsylvania."

Stauffer it was not a promise of money to him. Since the word "to" immediately follows the words "money or thing of value" and not the word "promises," it is possible to read the statute as requiring that the recipient of the money or thing of value be the "person, firm, or corporation" which the statute describes. But either construction of the statute covers the classic three-party case: e. g., A tells X he will give $1,000 to Y if X will use influence to get him a job. Under the first construction this is a promise of $1,000 to X in consideration of the use of influence. Under the second construction this is a promise to give money to Y in consideration of a promise to use influence; a standard third-party beneficiary situation. The only difficulty with this second construction in the context of this case is the necessity of finding that the Republican Party is a "person, firm, or corporation," as those words are used in the statute. The Republican Party is not a legal entity. It is an amorphous group of individuals that acts and only can act through persons. Its funds are received and managed by persons. Certainly the word "person" in the statute is broad enough to include the Republican Party, and since the content and manifest purpose of the statute confirm, as we shall see, such a construction, it would unjustifiably contract the law to withdraw gifts to the Republican Party from its scope.[2]

---

[2] Whether the word "person" in a particular statute includes a particular body, a corporation, or association is essentially a matter of construction of that statute, aided, where possible, by general statutory definitions. If the purpose of a statute is such as to dictate the inclusion of a particular body within its scope then the statute is generally so interpreted. Since 18 U. S. C. § 214 was aimed at prohibiting the purchase of influence, it is difficult to conclude that Congress would prohibit payments to firms and corporations and not proscribe payments to political organizations, since the influence of political parties in securing jobs and their involvement in the patronage process is greater than that of private companies. We must be blind not to know that among the abuses which led to the legislation

Thus, no matter how the statute is read, one thing is clear—its terms cover this case. Shirey's endeavor to purchase himself a postmastership as alleged has been interdicted by the Congress. Awkwardness is not ambiguity, nor do defined multiple meanings, each of which is satisfied by the allegations of the information, constitute a want of definiteness.

Not only does the compulsion of language within the statutory framework seem clear, but the purpose and history of the enactment powerfully reaffirm the meaning

---

were gifts to political parties and campaign treasuries, etc. Although these mostly took the form of payments to local chairmen, etc., there is no reason to assume that Congress meant to proscribe the payment to the officer of the Party but if a check were made out to the Party itself, a check which could be cashed and used by the officers of the Party, it was not outlawed.

In *Georgia* v. *Evans*, 316 U. S. 159, the Court decided that § 7 of the Sherman Act allowing "any person" to bring a treble damage action, allowed the State of Georgia to bring such an action. This was in the face of an earlier case holding that the same act did not allow the United States to sue. In reconciling the cases the Court pointed out that the scope of the word "person" depended on its "legislative environment," and pointed to the differences in considerations which led to the exclusion of the United States and the inclusion of Georgia.

In *Ohio* v. *Helvering*, 292 U. S. 360, a statute taxed "persons" selling liquor. Person was defined to include "partnership, association, company or corporation, as well as a natural person." The Court decided this allowed a State to be taxed, saying that the meaning of the word person "depends upon the connection in which the word is found."

In *Stanley* v. *Schwalby*, 147 U. S. 508, the Court said that the word "person" in a Texas statute of limitations included the United States, and thus the United States could claim the benefit of the statute. The Court said that "the word 'person' in the statute would include them as a body politic and corporate."

Under these principles the statutory context here clearly calls for including the Republican Party within the term "person."

yielded by its language. The bill was first introduced in Congress with a Committee Report which stated:

"This bill seeks to punish the purchase and sale of public offices. Certain Members of Congress have brought to the attention of the House both by speeches on the floor and statements before the Judiciary Committee a grave situation, disclosing corruption in connection with postal appointments in Mississippi and South Carolina. It is believed that this bill will prevent corrupt practices in connection with patronage appointments in the future." H. R. Rep. No. 1366, 69th Cong., 1st Sess.

The information in this case deals with the very kind of situation that gave rise to the provision under scrutiny. In the years preceding the enactment of this legislation members of Congress referred to contributions to party treasuries and to campaign funds, as well as direct payments to those in charge of patronage, as among the corrupt methods of obtaining postmasterships.[3] See, e. g., 65 Cong. Rec. 1408–1413. These revelations on the floor of the Congress, as disclosed by the authoritative history of enactment, indicate the aim of Congress to proscribe

---

[3] The bill was introduced by Congressman Stevenson. 67 Cong. Rec. 6419. Two years before, in describing the "corruption in connection with postal appointments in . . . South Carolina" to which the Committee Report refers, Congressman Stevenson said, in response to the question "Where did this money finally find its home?":

"I do not know. As I said here once before, I doubt if much of it gets to the Republican executive committee, but I do not care where it goes. Either it goes into his pocket and the pockets of his machine or it goes into the coffers of the Republican Party. If it does, it is the most blatant defiance of the civil service law that any party has ever had the hardihood to put over, and it is as disgraceful as the Teapot Dome proposition any day." 65 Cong. Rec. 1410.

payments to political parties in return for influence. Indeed this form of payment was a major concern of Congress. Certainly we cannot infer that Congress expressed this concern in self-defeating terms.[4]

Statutes, including penal enactments, are not inert exercises in literary composition. They are instruments of government, and in construing them "the general purpose is a more important aid to the meaning than any

---

[4] When the bill which became § 1 of the Act of December 11, 1926 (now 18 U. S. C. § 214), was introduced in the House, it was coupled with a bill requiring the filing of an affidavit by certain officers of the United States. (This bill, with changes from its original wording, is now 5 U. S. C. § 21a.) Mr. Graham, introducing both bills, said: "They are correlative. I promised the committee and the gentlemen who are proponents of the bill that I would try to get unanimous consent to consider both bills together." 67 Cong. Rec. 10840.

The text of this "correlative" bill was as follows:

"*Be it enacted, etc.,* That each individual hereafter appointed as an officer of the United States by the President, by and with the advice and consent of the Senate, or by the President alone, or by a court of law, or by the head of a department, shall, within 30 days after the effective date of his appointment, file with the Comptroller General of the United States an affidavit under oath stating that neither he nor anyone acting in his behalf has given, transferred, or paid any consideration for or in the expectation or hope of receiving assistance in securing such appointment.

"SEC. 3. When used in this Act the term 'consideration' includes a payment, distribution, gift, subscription, loan, advance, or deposit of money, or anything of value, or a contract, promise, or agreement, whether or not legally enforceable, to make such a payment, distribution, gift, subscription, loan, advance, or deposit." *Ibid.*

This Act has been since amended, but the portions here relevant—the last phrases of § 1—remain unchanged. This is the affidavit Shirey would have to file were he appointed Postmaster of York. It is clear that he could not truthfully file such an affidavit if the allegations of the information are true. The fact that the sponsor of both bills expressly declared them to be correlative is persuasive evidence that an act which would make the oath impossible to take is a violation of § 214.

rule which grammar or formal logic may lay down."
*United States* v. *Whitridge,* 197 U. S. 135, 143. This is
so because the purpose of an enactment is embedded in
its words even though it is not always pedantically
expressed in words. See *United States* v. *Wurzbach,* 280
U. S. 396, 399. Statutory meaning, it is to be remem-
bered, is more to be felt than demonstrated, see *United
States* v. *Johnson,* 221 U. S. 488, 496, or, as Judge Learned
Hand has put it, the art of interpretation is "the art of
proliferating a purpose." *Brooklyn Nat. Corp.* v. *Comm'r,*
157 F. 2d 450, 451. In ascertaining this purpose it is
important to remember that no matter how elastic is the
use to which the term scientific may be put, it cannot be
used to describe the legislative process. That is a crude
but practical process of the adaptation by the ordinary
citizen of means to an end, except when it concerns
technical problems beyond the ken of the average man.

Applying these generalities to the immediate occasion,
it is clear that the terms, the history, and the manifest
purpose of 18 U. S. C. § 214 coalesce in a construction of
that statute which validates the information against
Shirey.[5] The evil which Congress sought to check and the
mischief wrought by what it proscribed are the same when
the transaction is triangular as when only two parties are

---

[5] This Court reviews judgments, not arguments assailing them or
seeking to sustain them. See *Williams* v. *United States,* 168 U. S. 382,
389. The judgment which the Government brought here for review
under the Criminal Appeals Act of 1907 is that "The information
does not state facts sufficient to constitute an offense against the
United States." The correctness of this judgment depends on the
construction of 18 U. S. C. § 214 and more particularly whether
that section supports the allegations of the information. Arguments
invoked by the Government do not determine the meaning of a
statute nor do they define the scope of our inquiry into its meaning.
If § 214 brings the allegations of this information within its scope,
an offense is charged and the course of the Government's reasoning
is beside the point.

involved.[6] It is incredible to suppose that Congress meant to prohibit Shirey from giving $1,000 to Stauffer, to be passed on by the latter to the Party fund, but that Shirey was outside the congressional prohibition for securing the same influence by a promise to deposit $1,000 directly in the Party's fund. That is not the kind of finessing by which this Court has heretofore allowed penal legislation to be construed. See, *e. g., United States* v. *Mosley,* 238 U. S. 383, and *United States* v. *Saylor,* 322 U. S. 385.

The judgment is                                    *Reversed.*

MR. JUSTICE DOUGLAS, concurring.

The argument that § 214 requires the payment of money or other thing of value be made to the person who is to use his influence "to procure" an "appointive office" is not frivolous. The legislative history shows that that was one of the evils against which Congress acted. But I am also convinced that Congress moved against the other evil as well—payment to a political party for the use of "influence to procure any appointive office." The abuse in appointing postmasters during the Coolidge administration was the occasion for the law; and then as now (if the allegations in the information are to be

---

[6] It is claimed that because § 2 of the Act of December 11, 1926, 44 Stat. 918, which deals with the user of influence, is restricted in scope to the "payee" of the money or thing of value, a similar restriction must be read into § 1. There is not one shred of evidence in the legislative history or in the statutes themselves to indicate that the two sections are in any way to be read *"in pari materia."* In fact, normal principles of statutory construction tell us that the use of the word "payee" in § 2, and its absence in § 1, is convincing evidence that the provisions are different in scope and not congruent. A look at the other statutes in the bribery and graft section of 18 U. S. C. shows that the wording of other Acts directed to the receipt and offer of bribes, etc., is not identical in the statute directed to offer and that directed to receipt. Whether this would mean a difference in ultimate construction is not now our concern.

believed) payments for those offices sometimes went to the party, sometimes to a politician. As Congressman Stevenson, who later introduced the measure in the House, said in answering a question as to who gets the money paid for "the appointive office":

> "Either it goes into his pocket and the pockets of his machine or it goes into the coffers of the Republican Party. If it does, it is the most blatant defiance of the civil service law that any party has ever had the hardihood to put over, and it is as disgraceful as the Teapot Dome proposition any day." 65 Cong. Rec. 1410.

The words used in § 214 are broad enough to include both evils.

I have sometimes felt, as my dissents show (see *United States* v. *Classic,* 313 U. S. 299, 331; *Rosenberg* v. *United States,* 346 U. S. 273, 310; *United States* v. *A & P Trucking Co.,* 358 U. S. 121, 127), that the Court has not always construed a criminal statute so as to resolve doubts in favor of the citizen. But that principle—as highly preferred as any in a government of laws—does no service here. To hold the conduct charged in this information outside the Act is to find ambiguities and doubts not obvious on the face of the legislation, nor justifiably imputed from the legislative history. The inclusion in the original version of § 215 of limiting words can indicate no more than that Congress intended a narrower scope for that section than for § 214. It does not show that § 214 was to be similarly narrowed.

Accordingly I join the opinion of the Court.

MR. JUSTICE HARLAN, whom MR. JUSTICE BLACK, MR. JUSTICE WHITTAKER, and MR. JUSTICE STEWART join, dissenting.

The Government's primary contention in this case is that an offer to a Congressman to make contributions of

money to his political party is an offer of a "thing of value" to that Congressman within the meaning of 18 U. S. C. § 214. The Court, in ignoring this contention, appears to believe that it is not supportable. The Court holds, however, that the information here involved nevertheless states an offense under § 214 on either of two theories, (1) that the offer alleged is an offer of money to Congressman Stauffer (a theory not even advanced by the Government), or (2) that the Republican Party is a "person" within the meaning of § 214, and that the offer alleged is an offer of money to that "person." In light of the history of § 214, and with proper regard for the principle that an essentially ambiguous criminal statute is to be strictly construed, I cannot agree that this information states an offense under § 214.

Dealing with the Government's principal contention, which the Court by-passes, the information does not charge that Congressman Stauffer would have received any direct, tangible benefit from the payment of money to the Republican Party. The initial problem, therefore, is to decide whether the term "thing of value" is sufficiently broad to embrace any act which might constitute an inducement to the person to whom the offer to do the act is made. The history of the statute of which § 214 was passed as a part sheds clarifying light on this problem.

Title 18 U. S. C. § 214 was originally enacted as § 1 of a statute (44 Stat. 918) designed to "punish the purchase and sale of public offices." See H. R. Rep. No. 1366, 69th Cong., 1st Sess. Section 2 of that statute read on the "seller" of influence as opposed to the "purchaser," and in the 1948 codification became what is now the first paragraph of 18 U. S. C. § 215.[1] As originally enacted § 2 provided:

> "It shall be unlawful to solicit or receive from anyone whatsoever, either as a political contribution,

---

[1] See Note 4, *infra*.

or for personal emolument, any sum of money or thing of value, whatsoever, in consideration of the promise of support, or use of influence, or for the support or influence *of the payee,* in behalf of the person paying the money, or any other person, in obtaining any appointive office under the Government of the United States." (Emphasis added.)

I think it plain that this language would not have reached one who solicited, in consideration of the promise of his influence, a general political contribution of money to be paid directly to his party. Under such circumstances the political party would be the "payee" of the money, but it would be the influence of the solicitor, as opposed to that of the party, which was promised. And although the payment of money to the solicitor's party might well be "valuable" to him in the sense that it would induce him to exert influence, the use of the word "payee," an extremely unconventional term to describe the recipient of indefinite and intangible benefits which might flow from the payment of money to another, shows that it was not contemplated that such an indirect inducement should be considered a "thing of value" in the statutory sense.

Confirmation for this view is found in a letter of Attorney General Clark written to the Senate on February 19, 1946, in connection with an amendment to 44 Stat. 918 proposed to deal with the solicitation of fees by private employment agencies for referring persons to federal employment openings. In contrasting the language of the proposed amendment with that of § 2 of 44 Stat. 918 the Attorney General was of the opinion that the solicitation provisions of the existing statute reached only the solicitation of political contributions or emoluments "on behalf of the solicitor himself." [2]

[2] The Attorney General wrote: "Further, under the proposed language, the solicitation or receipt of compensation, either on behalf of the solicitor *or another,* would be prohibited, whereas the existing

This proposed amendment was enacted into law in 1951. 65 Stat. 320. Its effect was merely to add to present § 215 what is now the second paragraph of that section.[3] The amendment did not disturb the first paragraph of § 215, which alone is relevant in the "use of influence" context, and which, as it had formerly stood in 44 Stat. 918, had been construed by the Attorney General as already indicated.

In the 1948 codification the Revisers, in carrying over into § 215 of the present Code § 2 of 44 Stat. 918, omitted the language which had expressly restricted its scope to a situation where the influence of the "payee" is promised.[4] But it is apparent that this omission was not

---

law merely prohibits the solicitation or receipt of compensation, either as a political contribution or personal emolument *on behalf of the solicitor himself.*" (Emphasis added.)

The Attorney General's letter first appears in S. Rep. No. 1036, 79th Cong., 2d Sess., and was carried over into a series of Senate Reports on bills embodying the proposed amendment. S. Rep. No. 2, 80th Cong., 1st Sess.; S. Rep. No. 7, 81st Cong., 1st Sess.; S. Rep. No. 3, 82d Cong., 1st Sess.

[3] That paragraph provides:

"Whoever solicits or receives any thing of value in consideration of aiding a person to obtain employment under the United States either by referring his name to an executive department or agency of the United States or by requiring the payment of a fee because such person has secured such employment shall be fined not more than $1,000, or imprisoned not more than one year, or both. This section shall not apply to such services rendered by an employment agency pursuant to the written request of an executive department or agency of the United States."

[4] The relevant portion of 18 U. S. C. § 215 reads:

"Whoever solicits or receives, either as a political contribution, or for personal emolument, any money or thing of value, in consideration of the promise of support or use of influence in obtaining for any person any appointive office or place under the United States, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

intended to work a substantive change in the statute.[5] Under these circumstances the solicitation provisions of present § 215 must be read in the light of their history, and so read they require the conclusion that their impact is restricted to "the solicitation or receipt of compensation . . . on behalf of the solicitor himself." [6]

Given this conclusion, I turn once more to § 214, the provision directly involved in this case. The Government has strongly urged, in an effort to avoid the District Court's holding that the specific mention of "political contribution" in § 215 implied its exclusion from the term "thing of value" in § 214, that the two sections are plainly reciprocal and must be construed *in pari materia*. I agree. There is not the slightest indication in the sparse legislative history that Congress intended that the "purchase" and "sale" provisions of the statute should have different scope, nor has any reason which would reasonably support a difference in scope been suggested to us.[7] I

---

[5] The Reviser's Note refers expressly to other substantive changes made in the section at the time of codification, and appears to class the omission of the "payee" language under "changes in style."

It is also noteworthy that the Senate Report on the bill which became the "employment agency" amendment to § 215 in the 82d Congress, three years after the codification of Title 18, contained the letter of the Attorney General construing the precodification language with no suggestion that the meaning of that language had been altered by the changes made at the time of codification. See S. Rep. No. 3, 82d Cong., 1st Sess.

[6] See Note 2, *supra*.

[7] That the two provisions are reciprocal is further shown by the fact that the same substantive and stylistic changes were made in both of them in 1948, the Reviser's Note under § 215 merely incorporating that under § 214 by reference.

It is argued that this conclusion is controverted by the circumstance that on the same day as 44 Stat. 918 was introduced, another bill, also 44 Stat. 918 (now 5 U. S. C. § 21a), was also introduced requiring those appointed to public office under the United States to file affidavits that they had not paid any consideration to *anyone* in the

cannot believe that Congress intended that although a Congressman soliciting the kind of party contribution charged in this information in return for his influence would not be covered under § 215 (as the Court appears to concede is so), nevertheless the individual from whom the contribution was solicited would, by promising to make it, become guilty of a crime against the United States under § 214 (as the Court now holds). For surely Congress could not have been less eager to reach corruption on the part of government officials than attempts by individuals to take advantage of that corruption. It follows that just as the solicitation of political contributions to be paid directly to a party treasury in return for the promise of the solicitor's influence is not interdicted by § 215, the converse of that situation, the offering to a Congressman of a contribution payable directly to his party's treasury, in return for the promise of his influence, is not reached by § 214.[8]

Given these considerations, even if the Court were right in holding that the conduct here alleged is an offer of money to Congressman Stauffer I would think it wrong in going on to decide that the information states an offense under § 214. Entirely apart from the statutory history, however, I think it a remarkable construction of the language of § 214 to find that an offer to X to pay money to Y, with whom X is not claimed to have any

expectation of receiving appointment, and that the two bills were described as "correlative." There is no reason to take the word "correlative" to imply an identity of scope between the two bills, since the word equally well bears the interpretation that 5 U. S. C. § 21a was intended to be merely supplementary to the criminal provisions of §§ 214 and 215. Indeed, it is on its face broader than § 214 in its reference to mere "assistance" as opposed to "influence."

[8] This is not, of course, to suggest that an offer of a "political contribution" to a Congressman's personal campaign fund in return for his promise of influence would be without the scope of § 214, or that the solicitation of such a contribution would not fall within § 215.

financial relationship, is an offer of money to X. Under these circumstances there is an offer to X, but it is plainly an offer to perform an act (pay money to Y) rather than an offer of money to X. The statute does not say that any offer to a person involving money is rendered criminal if the other statutory criteria are met, but only that an offer of *money to a person* may be.

My reading of the statute makes it unnecessary to decide whether, as the Government further contends and the Court holds, the Republican Party is a "person" within the meaning of § 214, although I would have considerable difficulty in holding that what is characterized by the Court as an "amorphous group of individuals" fits within this term, particularly when Congress saw fit explicitly to add references to "firm" and "corporation" to secure the inclusion of these entities.[9] I think that the use of the words "of the payee" in what is now § 215 merely made explicit what was intended to be implicit in § 214—that the "influence" sought must be that of the "person, firm, or corporation" to whom any money or thing of value is promised or paid.[10] And although the information does not charge in terms that it was the influence of Congressman Stauffer, as opposed to that of the Republican Party, which was sought by appellee, it is clear from the brief and argument of the Government in this Court that it stands on the former construction of the information.

It is of course true, as the Government argues, that relatively indirect and subtle inducements may contain the seeds of the same mischief as the crudest bribery. But "it would be dangerous, indeed, to carry the prin-

---

[9] All of the cases cited by the Court in this connection involve clearly defined entities—not "amorphous" groups.

[10] It is apparent that the Revisers believed that the omission of the words "of the payee" in the recodification of 44 Stat. 918 added nothing to the meaning of § 215. See p. 266, *supra.*

ciple, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated." *United States* v. *Wiltberger*, 5 Wheat. 76, 96. In light of the considerations discussed above it cannot be said that Congress in 18 U. S. C. § 214 has unequivocally seen fit to outlaw conduct of the kind charged in this information.[11] The most that can be said in favor of the Government's position is that the statute is highly ambiguous in the respect involved here, and this in any event should require rejection of the Government's position under principles discussed in *Bell* v. *United States*, 349 U. S. 81. I would affirm.

---

[11] The Court derives support for its holding from various statements concerning official corruption in office selling made on the floor of the House of Representatives some two years before the passage of the bill which is now §§ 214 and 215. Since these statements were directed exclusively to revelations of corruption on the part of sellers of influence and the Court appears to concede that the seller of influence is not covered by § 215 unless he is a "payee," it is difficult to see how these statements can be utilized to support a broader reading of § 214.