ACETO CHEMICAL CO., INC. v. UNITED STATES (No. 5156)*

---

*C.A.D. 846.

United States Court of Customs and Patent Appeals, June 25, 1964

*Samuel I. Hendler*, for appellant.

*John W. Douglas*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section, *Herbert L. Warren*, for the United States.

[Oral argument April 6, 1964, by Mr. Hendler and Mr. Warren]

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Jr., Associate Judges

RICH, Judge, delivered the opinion of the court:

This appeal is from the judgment of the Appellate Term, Second Division (A.R.D. 159), of the United States Customs Court, in part affirming and in part reversing the judgment of the trial court (Reap. Dec. 10220) in a reappraisement proceeding involving an importation of acetoacetanilide.

The merchandise, exported from England 8 April 1960, was appraised on the basis of American selling price under section 402(e) of the Tariff Act of 1930 as amended by the Customs Simplification Act of 1956 (T.D. 54165), pursuant to the provisions of paragraph 27(c) of said act, as amended. The appraiser found a value of 80¢ per pound, the price at which Union Carbide Corporation, an American producer, sold acetoacetanilide to certain customers.

The appellant contends for a price of 72.22¢, which is not shown to be the price at which anyone ever sold the merchandise, on the basis of sales by Union Carbide to one customer at 72.75¢ less a proved shipping expense (freight rate) to the nearest customer of .53¢ per pound.

The sole issue is: What is the American selling price?

The statutes involved on the issues before us, which must be read together, provide as follows (all emphasis ours):

SEC. 402. VALUE.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(e) *American Selling Price.*—For the purposes of this section, the American selling price of any article produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the article in condition packed ready for delivery, at which such article is *freely sold or, in the absence of sales, offered for sale* for domestic consumption in the principal market of the United States, *in the ordinary course of trade* and in the usual wholesale quantities, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such article when sold for domestic consumption *in the ordinary course of trade* and in the usual wholesale quantities of trade, at the time of exportation of the imported article.

(f) *Definitions.*—For the purposes of this section—

(1) The term *"freely* sold or, in the absence of sales, offered for sale" means *sold or*, in the absence of sales, *offered*—

(A) *to all purchasers at wholesale*, or

(B) in the ordinary course of trade *to one or more selected purchasers at wholesale* at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

The facts which we need to consider, relating to Union Carbide's selling prices at the relevent time, are not in dispute and may be summarized as follows: Acetoacetanilide is primarily used in the manufacture of organic yellow pigments and United States consumption is from 1,500,000 to 2,000,000 pounds a year, five to six hundred thousand pounds being imported. The plaintiff imports from four to five hundred thousand pounds. Union Carbide is the principal U.S. producer, selling at least 65% of the total marketed in the United States, and produced records of its sales for the first 4 months of 1960. During this period, Union Carbide sold acetoacetanilide to various customers at various prices. It had a scheduled price of 80¢ per pound in carload lots and 81¢ for less than carload lots. From January 1 through April 30, 1960, the total quantity it sold was 291,450 pounds. There were 51 sales to 18 customers, 12 buying 181,700 pounds at the 80¢ and 81¢ prices. 105,750 pounds were sold to

other customers at lower prices ranging from a low of 72.75¢ to a high of 73.75¢. One customer made four purchases of 1000 pounds each at the low of 72.75¢. The testimony of a product manager of Union Carbide called by plaintiff, explains that those paying the prices below the scheduled prices did so

\* \* \* because we were advised by these customers that they were able to buy material of foreign manufacture, imported material, at the prices that are indicated, and upon that advice, we agreed to supply them to meet that competition. In every case the prices differ, but the advice from the customer was such that the price indicated was the competitive price that we had to meet to retain our business.

What the trial court did and what appellant contends is succinctly summed up in the following paragraphs from appellant's brief:

The Trial Court found that 72¾ cents per pound was the price at which acetoacetanilide was sold by the domestic producer in the ordinary course of trade and that such price "fairly reflects the market value of the merchandise" \* \* \*. 72¾ cents per pound was the price at which Union Carbide Corporation was willing (but not compelled) to sell, and the price at which a purchaser was willing (but not compelled) to buy acetoacetanilide. We submit that the Court was correct except that freight allowances (as hereinafter argued) should be deducted. \* \* \*

72¾ cents per pound was the price at which 4,000 pounds of acetoacetanilide was sold to Customer I \* \* \*. It was the lowest price reached after negotiation and fairly reflects the market value of the merchandise. This was *the price of the market place*, and, therefore, *the real market value.* It was the price fixed by negotiation and mutual agreement as between a vendor who was willing to sell and a purchaser who desired to buy.

The Appellate Term agreed with the trial court only in holding that no deduction of .53¢ per pound for freight should be made but on the main issue reversed and found that the appraised value of 80¢ was the correct one. The government brief summarizes the rationale of the Appellate Term's opinion by saying,

\* \* \* because *sales* were made at *varying* prices, the sales cannot be considered in determination of American selling price. However, since the merchandise was freely offered to all purchasers at 80 cents per pound, such *offers* established the correct value, in the absence of a selling price which conformed to the statutory requirements. [Our emphasis.]

The Appellate Term held that, in any event, resort could not be had to section 402(f)(1)(B) because that section, by referring to selected purchasers, is intended to apply only where the relevant market is restricted.

The last-mentioned statutory clause is, clearly, the basis of the trial court's decision and the mainstay of appellant's argument.

The Government predicates its position on other language in sections 402(e) and (f). Both parties presume to be making literal interpretations of the statute. Appellant claims the statute is entirely clear. The existence of the present case and the divers meanings put

on the same language refute the last contention. The Appellate Term's opinion adds fuel to the fire by concluding:

As has been heretofore observed, although actual sales existed, they must be disregarded, because they do not establish one price for this merchandise. Hence, in contemplation of law, there was, in effect, an absence of sales, and offers for sale became relevant and necessary elements in the determination of American selling price.

While we agree with the judgment of the Appellate Term, we think a better foundation for it exists than a conclusion that actual sales are absent, "in contemplation of law."

The situation here, as we see it, comes to this. Union Carbide, while it had established prices at which it sold a major part of its product, also made some sales at various slightly lower prices, so that it cannot be said that it had any *one* selling price as reflected in its actual *sales*. It did, however, have a single list price at which the product was *offered* to all purchasers at wholesale and at which any such purchaser could buy. It was this offering price—a price at which most sales actually were made—which the Appellate Term found to be within the terms of the statute after finding that the actual sales should be disregarded.

We agree that the prices shown by the actual sales should be disregarded for the reason that the only sales prices that can be considered are those at which the article is "*freely* sold [402(e)]." (Our emphasis.) That term, as defined in 402(f), means, first, "sold * * * to all purchasers at wholesale * * *." [(f)(1)(A)] Clearly, Union Carbide did not *sell* to *all* purchasers at wholesale at the prices below 80¢ and so the article was not "freely sold" at those prices. For that reason they are to be disregarded.

While it cannot be denied, in fact or in "contemplation of law," that there were sales, those sales below 80¢ are not prices "at which such article is freely sold" within the terms of the statute. While it dealt with application of a statutory provision pertaining to goods freely *offered*, rather than freely sold, to all purchasers, the reasoning in *United States* v. *Mexican Products Co.*, 28 CCPA 80, C.A.D. 129, appears applicable here. In that case, as the result of bargaining, goods were sold at various discounts from list price as well as at list price. Some purchasers got no discount. This court held that the list price was the only price at which the goods were offered *to all purchasers*.

In section 402(e), the plain alternative to "freely sold" is "freely * * * offered for sale" which is likewise defined in (f)(1)(A) as "offered * * * to all purchasers at wholesale * * *." This provision, in our opinion, exactly fits the situation here since the article was offered to *all* purchasers at the scheduled price of 80¢ in carload

lots. The Appellate Term, in agreement with the appraiser, held that this offered price was the American selling price. Its conclusion of law "2" states:

2. That, by the terms of said definition, where there is no single price at which merchandise is sold to all purchasers at wholesale, offers for sale to all purchasers at wholesale which otherwise conform to the statutory description must be considered in arriving at a value based on American selling price.

This holding is contrary to one of appellant's principal contentions which is that when there *are* sales, offers cannot be considered. This position is based on a literal reading of the words, "freely sold or, *in the absence of sales*, offered for sale" (our emphasis). The italicized phrase must be given some meaning but we cannot agree that it should be given the literal meaning ascribed to it by appellant.

As Mr. Justice Frankfurter stated, in the principal opinion in *United States* v. *Shirey*, 359 U.S. 255:

Statutes, including penal enactments, are not inert exercises in literary composition. They are instruments of government, and in construing them "the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down." *United States v. Whitridge*, 197 U.S. 135, 143. This is so because the purpose of an enactment is embedded in its words even though it is not always pedantically expressed in words. See *United States v. Wurzbach*, 280 U.S. 396, 399. Statutory meaning, it is to be remembered, is more to be felt than demonstrated, see *United States v. Johnson*, 221 U.S. 488, 496, or, as Judge Learned Hand has put it, the art of interpretation is "the art of proliferating a purpose." *Brooklyn Nat. Corp. v. Comm'r*, 157 F. 2d 450, 451. In ascertaining this purpose it is important to remember that no matter how elastic is the use to which the term scientific may be put, it cannot be used to describe the legislative process.

Judge Learned Hand, in *Peter Pan Fabrics* v. *Martin Weiner Corp.*, 274 F. 2d 487, 124 USPQ 154 (CA 2, 1960), said:

On the other hand, it is a commonplace that a literal interpretation of the words of a statute is not always a safe guide to its meaning. Indeed, in extreme situations this doctrine has been carried so far that language inescapably covering the occasion has been disregarded when it defeats the manifest purpose of the statute as a whole. Holy Trinity Church v. United States, 143 U.S. 457; Markham v. Cabell, 326 U.S. 404; Cawley v. United States, 2 Cir., November 23. 1959. [P. 156.]

While appellant strenuously urges its point, arguing that we cannot look to the offering price because there were actual sales at other prices, no reasons are given to support this interpretation other than the fact that the words are there. To adopt this meaning, however, could lead to results clearly not contemplated by Congress. The sales which we have before us, being at a variety of prices, make it impossible to determine, from them, an American selling price unless we arbitrarily pick the price at which one of such sales were made. There is not,

therefore, *such* a selling price as will serve the purposes of the statute. There is thus an "absence of sales" to establish "*the* price * * * at which such article is *freely* sold * * *." (Our emphasis.) We think this is such an absence as Congress intended to bring into effect the expressly stated alternative "or * * * offered for sale * * *." We therefore agree with the conclusion of the Appellate Term on this issue. In doing so, we note that the lower court reviewed at length the legislative history of the language under consideration and found, for reasons with which we agree, that it supports its construction of the statute. We do not consider it necessary to review the matter again.

We are also in full agreement with the lower court that we do not reach section 402(f)(1)(B) for the reason that it applies only to a situation in which sales of the American producer are restricted and it *selects* one or more purchasers, restricting its sales to them and not selling or offering its merchandise for sale to all purchasers at wholesale. That situation does not exist here.

The one remaining issue is the matter of the freight charge. Appellant's contention is that the American selling price should be arrived at by deducting a charge of .53¢ per pound, which was disallowed in both lower tribunals and is opposed by the Government.

The record here shows that all sales and offers of sale by Union Carbide were at prices which included delivery charges, regardless of the purchaser's location. The goods were never sold or offered for sale at a price excluding delivery charges. Appellant bases its contention of the language "in condition packed ready for delivery" in section 402(e), arguing that "to find the price ready *for* delivery, one must deduct the cost *of* delivery." Appellant then concedes that "no case establishing this theory could be found."

We agree with the lower court's ruling:

The important factor in the determination of whether or not inland freight charges are to be excluded in the determination of the value of imported merchandise is whether or not the merchandise is ever sold or offered for sale at prices which do not embrace freight charges. *United States* v. *Heffernan Paper Co.*, 13 Ct. Cust. Appls. 593, T.D. 41454; *United States* v. *Traders Paper Co. et al.*, 14 Ct. Cust. Appls. 293, T.D. 41909; *United States* v. *Zellerbach Paper Co.* (*Hoyt, Shepston & Sciaroni*), 28 CCPA 303, C.A.D. 159; *United States* v. *Paul A. Straub & Co., Inc.*, 41 CCPA 209, C.A.D. 553; *Albert Mattola etc.* v. *United States*, 46 CCPA 17, C.A.D. 689.

* * * If there is no other price than the one which includes the freight charge, then, under settled law, the freight charge is inextricably bound up, as an integral part of the purchase price, and may not be allowed.

The judgment below is *affirmed*.

MARTIN, J., sat but did not participate in decision.