391 F.2d 470
 SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent,
Minnkota Power Cooperative, Inc., Committee of Rural Electric Cooperatives, Dairyland Power Cooperative, Holy Cross Electric Association, Inc., and Empire Electric Association, Intervenors.
 No. 20960.
 United States Court of Appeals District of Columbia Circuit.
 Argued December 7, 1967.
 Decided February 15, 1968.
 Petition for Rehearing Denied March 14, 1968.
 
 Mr. Wallace L. Duncan, Washington, D. C., with whom Mr. Stephen A. West, Washington, D. C., was on the brief, for petitioners; also entered an appearance for intervenors Holy Cross Electric Association and Empire Electric Association.
 Mr. William H. Arkin, Attorney, Federal Power Commission, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Peter H. Schiff, Solicitor, Federal Power Commission, was on the brief, for respondent. Messrs. Richard A. Solomon, General Counsel, and Israel Convisser, Attorney, Federal Power Commission, also entered appearances for respondent.
 Mr. Reuben Goldberg, Washington, D. C., for intervenor Minnkota Power Cooperative, Inc.
 Mr. William C. Wise, Boulder, Colo., for intervenor Committee of Rural Electric Cooperatives.
 Mr. Floyd E. Wheeler, Madison, Wis., for intervenor Dairyland Power Cooperative.
 Before BAZELON, Chief Judge, and WRIGHT and ROBINSON, Circuit Judges.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 The Colorado-Ute Electric Association, Inc., respondent before the Federal Power Commission, is a non-profit cooperative association financed in large part with loans from the Rural Electrification Administration and organized under Colorado law. It is engaged in the generation, transmission and interstate sale of electric energy at wholesale. Its only customers are its 13 members who wholly own and control the Association and its electric system. Twelve of these 13 member-owners are themselves electric cooperatives engaged in the distribution and sale of electric energy to their consumer-owners in Colorado, Arizona, Utah, Wyoming and New Mexico, while the 13th, Salt River Project Agricultural Improvement and Power District, is a quasi-governmental arm of the State of Arizona. Nine of these cooperatives, along with Salt River, initiated the proceedings before the Commission which culminated in the order now under review.
 
 
 2
 In their "Petition and Complaint" the member-owners of Colorado-Ute named Colorado-Ute as respondent and sought an order from the Commission asserting jurisdiction over it as a "public utility" within the meaning of Parts II and III of the Federal Power Act[1] and requiring it to file its rate schedules for the transmission and sale of electric energy for resale in interstate commerce.
 
 
 3
 In Paragraph (5) of their petition and complaint, Colorado-Ute's member-owners request that the Commission assume jurisdiction pursuant to its emergency authority "to require by order that the Respondent Colorado-Ute continue the generation, transmission, distribution, delivery, interchange and sale of electric power and energy at wholesale in interstate commerce at the Hayden Plant, the decision and order of the Supreme Court of Colorado to the contrary notwithstanding." (Emphasis added.) The Colorado Supreme Court, in Western Colorado Power Co. v. Public Utilities Com'n of Colorado, 159 Colo. 262, 411 P.2d 785, appeal dismissed and cert. denied, 385 U.S. 22, 87 S.Ct. 230, 17 L.Ed. 2d 21 (1966), had ordered cancellation of a certificate of convenience and necessity previously issued by the Colorado Public Utilities Commission in 1963 giving Colorado-Ute authority to operate a 150,000-kilowatt normal capacity thermal generating plant at Hayden, Colorado.[2] These facilities were completed in July 1965 and have been in operation since. They are essential in providing the member-owners of Colorado-Ute with wholesale electric power and energy.
 
 
 4
 Petitioner's objective in their friendly suit before the Commission against their own Association was to nullify the Colorado Supreme Court's decision ordering cessation of the Hayden generating plant operations.[3] In its answer, Colorado-Ute admitted all the allegations in the complaint, except that it was a public utility as defined in the Act (as to which it merely requested a determination of its status), and it conditionally proffered for filing all of its contracts and rate schedules with its members. Petitioners, with Colorado-Ute's concurrence, then submitted the issues presented to the Commission on the pleadings and moved for a "final" decision without intermediate reference to a hearing examiner.
 
 
 5
 Meanwhile there was pending before the Commission a proceeding commenced in July 1963 to determine generally whether non-profit REA-financed rural electric cooperatives, like Colorado-Ute, should be required to comply with the Commission's reporting, accounting and rate schedule filing requirements as "public utilities" under the Act. Dairyland Power Cooperative et al., Docket No. E-7113 (July 22, 1963). Extensive hearings were held in which many REA-financed cooperatives intervened and set forth numerous reasons why they should not be considered "public utilities" under the Act even if they own or operate facilities for transmission or sale of electric energy in interstate commerce. The Secretary of Agriculture, on behalf of REA, intervened in support of the cooperatives' position. On January 5, 1967, the Commission issued its opinion finding that cooperatively-owned electric suppliers financed by REA do not fall within the scope of the Commission's regulatory jurisdiction over "public utilities." Dairyland Power Cooperative, Docket No. E-7113, 37 F.P.C. 12 (1967). The Commission concluded:
 
 
 6
 "* * * Congress never intended this Commission to regulate cooperatives under the Federal Power Act. This intention is reflected in the legislative history of the Federal Power Act, is confirmed by the legislative history of the Rural Electrification Act, is strengthened by subsequent expressions by the Congress and is ratified by this Commission's legislative interpretation. Over the past 30 years, these factors compel the conclusion that cooperatives financed by REA are not public utilities within the meaning of Part II of the Federal Power Act." 37 F.P.C. at 15.
 
 
 7
 Relying on its decision in Dairyland, the Commission on January 6, 1967, dismissed the petition and complaint of Colorado-Ute's member-owners and directed return of the rate schedules and service contracts Colorado-Ute had tendered. Petitioners subsequently filed for a rehearing and stay which were denied by the Commission on March 3, 1967. Petitioners now appeal to this court for review of the Commission's January 6 and March 3 orders.
 
 
 8
 * Though review here is not strictly of the Commission's Dairyland decision, the issues are precisely the same, and a determination that Colorado-Ute is a public utility under Parts II and III of the Act would topple the Dairyland determination as to REA-financed rural electric cooperatives generally. It is against this larger backdrop that the competing claims of the petitioners and the Commission must be appraised.
 
 
 9
 There are now nearly 1,000 rural electric cooperatives which own and operate electric systems financed by the United States, acting through REA, pursuant to the Rural Electrification Act of 1936. Approximately 45 of these cooperatives, such as Colorado-Ute, own and operate electric generating plants as well as transmission systems. The remainder simply own and operate distribution systems and buy the power and energy from others.
 
 
 10
 The Rural Electrification Administration which finances these cooperatives was first established by executive order[4] in 1935 to "initiate, formulate, administer, and supervise a program of approved projects with respect to the generation, transmission, and distribution of electric energy in rural areas." The objective was to provide electricity to those sparsely settled areas which the investor-owned utilities had not found it profitable to service. To this end REA makes long-term low-interest loans to approved non-profit cooperatives organized and owned by their consumer members, usually farmers, who have been unable to obtain electricity from any other source.
 
 
 11
 Through its lending authority REA exercises extensive supervision over the planning, construction and operation of the facilities it finances. The REA borrower as a condition of securing its loan must secure REA approval of its manager, engineer and counsel; of its construction contracts and contracts for purchase of materials, equipment and supplies; of its contracts for purchase and sale of power; of its insurance coverage, its purchase of land, and so on.[5] Moreover, REA's concern is not only with providing high standards of electric service and guaranteeing its loan, but also with reducing the cost of service to the cooperative's consumers. It furnishes retail rate schedules designed for rural use and assists distribution cooperatives in obtaining electric energy at reasonable costs.
 
 
 12
 Though REA regulation and supervision of cooperatives are, in many respects, far more comprehensive than those which the Federal Power Commission exercises over investor-owned utilities, there are certain areas, such as ratemaking, where the cooperatives enjoy a freer hand. But it is in these areas that, by their structural nature, the cooperatives are effectively self-regulating. They are completely owned and controlled by their consumer-members, and only consumers can become members. They are non-profit.[6] Each member has a single vote in the affairs of the cooperative, and service is essentially limited to members. No officer receives a salary for his services and officers and directors are prohibited from engaging in any transactions with the cooperative from which they can earn any profit.
 
 
 13
 The question, then, before the Commission in Dairyland and before this court now with respect to Colorado-Ute is whether Congress intended these peculiar entities, obviously quite unlike investor-owned utilities and subject to comprehensive regulation by another branch of the federal government, to be treated as public utilities within Parts II and III of the Federal Power Act. In Dairyland the Commission concluded that Congress did not so intend or, alternatively, even if the REA-financed cooperatives were public utilities under the Act, they were exempt from its coverage as instrumentalities of the Government under Section 201(f).[7] One day later the Commission applied its broad Dairyland ruling to Colorado-Ute in particular. We affirm that determination on the ground that Colorado-Ute, as an REA-financed cooperative, is not a public utility within the meaning of Parts II and III of the Federal Power Act.
 
 II
 
 14
 In reaching its decision in Dairyland the Commission examined the legislative history of both the Federal Power Act of 1935 and the Rural Electrification Act of 1936 and the relationship between the Acts themselves. It also considered its continuous 30-year administrative practice of non-regulation of REA-financed cooperatives and the congressional response to this practice, and concluded that Congress never intended it to regulate cooperatives under the Federal Power Act.[8]
 
 
 15
 In arguing that Colorado-Ute is subject to Commission regulation under Parts II and III of the Federal Power Act, petitioners' principal reliance is on the Act's plain language.[9] And admittedly REA cooperatives, such as Colorado-Ute, do seem to fall within the ambit of the Act's central phrase, "public utilities."[10] But in reviewing the Commission's disclaimer of jurisdiction over cooperatives, our concern is not simply with Congress' language, but with its logic as well. For statutes, as the Supreme Court has said, are "instruments of government," not "exercises in literary composition," United States v. Shirey, 359 U.S. 255, 260, 79 S.Ct. 746, 3 L.Ed.2d 789 (1959), and "[d]eparture from a literal reading of statutory language may * * * be * * * necessary in order to effect the legislative purpose." Malat v. Riddell, 383 U.S. 569, 571-572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966). We must look through the statute itself to what lay behind it.[11]
 
 
 16
 The Public Utility Act, of which the Federal Power Act was Title II,[12] emanated from an investigation conducted between 1928 and 1935 by the Federal Trade Commission at the direction of the Senate. This investigation disclosed rampant abuses in the investor-owned electric utility industry, and the F.T.C. did not mince its words in its report to Congress:
 
 
 17
 "In the last analysis the foregoing practices and the conditions which they have created must be judged not only by economic results but by ethical standards. It is not easy to choose words which will adequately characterize various ethical aspects of the situation without an appearance of undue severity. Nevertheless the use of words such as fraud, deceit, misrepresentation, dishonesty, breach of trust, and oppression are the only suitable terms to apply if one seeks to form an ethical judgment on many practices which have taken sums beyond calculation from the rate paying and investing public." (Footnote omitted.) SUMMARY REPORT OF THE FEDERAL TRADE COMMISSION TO THE SENATE OF THE UNITED STATES, Document 92, Part 73-A, 70th Cong., 1st Sess., p. 63 (1935).
 
 
 18
 The F.T.C. chronicled at length the venal conditions and iniquitous practices it had uncovered in the course of its investigation. These included manipulative practices permitting maximum control of operating facilities with minimum investment, arbitrary or imaginative overstating of fixed capital accounts to support excessive utility rate charges and in consequence to encourage the sale of value-inflated securities, disregard of prudent financing practices, creation of fictitious profits by means of unreal inter-company transactions and other similar devices, use of deceptive or unsound methods of accounting, manipulation of security markets, and exaction of excessive payments from operating companies for services rendered to them.
 
 
 19
 But of the 19 major abuses summarized, virtually none could be associated with the cooperative structure where ownership and control is vested in the consumer-owners. Consequently, the attention of the 74th Congress, in enacting the Federal Power Act, was focused on the sorts of evils associated exclusively with investor-owned utilities. It is not so surprising, therefore, that the same Congress which was soon to enact the Rural Electrification Act, then lurking in committee, paid such scant attention to it in passing the Federal Power Act.
 
 
 20
 The two Acts were aimed at wholly disparate problems and the supervisory agencies established under them were to deal with fundamentally different sorts of utilities. For, in contrast to the Federal Power Act, the Rural Electrification Act which was conceived contemporaneously was not the response to a need for reform in an immense and corrupted industry, but rather constituted simply an attempt, through rural electrification cooperatives, to bring economical electric power to the nine out of ten farms that were then without it.[13]
 
 
 21
 The legislative history of the Rural Electrification Act, like that of the Federal Power Act, sheds little light on the specific question of whether Congress intended the Federal Power Commission's jurisdiction to extend to REA-financed cooperatives. It is true that the debates in Congress over the proposed Rural Electrification Act do contain several references to the Federal Power Act passed the previous year. But, again, they are turgid, unrevealing and ambiguous. In fact Congress' apparent lack of attention to any significant relationship between the Commission and the Rural Electrification Administration is doubtless more suggestive than anything to be found in the legislative history itself. For if REA cooperatives were to be made subject to Commission jurisdiction, Commission conflict with the authority of the Rural Electrification Administration was inevitable. Consequently this apparent indifference indicates that those entities under the Administrator's jurisdiction — the REA-financed cooperatives — were not intended to fall within that of the Commission. If anything the emphasis in Congress was on the Administrator's need for "almost unlimited discretion" and "extraordinary power" if he were to oversee effectively the rural electrification program.[14] We think the congressional unconcern with the impact of the "other" statute on the one it was enacting, coupled with the fact that the statutes are directed at very different problems, strongly supports the Commission's position that it is without jurisdiction over REA-financed cooperatives under Parts II and III of the Act.
 
 
 22
 Still further strengthening the Commission's interpretation is the fact that it is consistent not only with over 30 years of its administrative practice under the Federal Power Act, but also with 30 years of administration of the Rural Electrification Act.[15] Moreover, these are practices of which Congress has been well aware, but with which it has never tampered. Until the Commission raised the issue, sua sponte, in Dairyland, it had not formally considered the applicability of its manifold powers under Parts II and III of the Act to REA cooperatives. Though there have been occasional, infrequent findings of public utility status of REA cooperatives in proceedings which involved them only tangentially as facets of the Commission's delegated power over true investor-owned public utilities,[16] the Commission has never sought to exercise general regulatory authority over them.[17] And though there have been amendments to the Federal Power Act introduced in Congress, some of which would have impinged on REA jurisdiction and others of which would have proclaimed its independence,[18] none has been enacted. Petitioners argue that Congress' inaction in affirming the independent status of REA cooperatives vis-à-vis the Federal Power Commission indicates that legally no such independence exists. But though it is hazardous to draw any conclusion from congressional inertia, particularly with respect to a variety of bills with diverse objectives, we think that, if anything, Congress' inaction here tends to demonstrate its endorsement of the long continued administrative practice of the agencies in operating independently of each other.
 
 
 23
 The dispositional persuasiveness of such long established administrative practices is augmented where, as here, they were initiated "`by the men charged with the responsibility of setting [the statute's] machinery in motion,'" United States v. American Trucking Ass'ns, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345 (1940), and where, as here, the interpretive aid of specific legislative history is unavailing. Philadelphia Television Broadcasting Co. v. F.C.C., 123 U.S.App.D.C. 298, 300, 359 F.2d 282, 284 (1966).[19] We think the Commission was right in looking beyond the words of the statute to its underlying purpose and in concluding that Colorado-Ute did not fall within its jurisdiction.[20]
 
 
 24
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 16 U.S.C.A. §§ 791aet seq. (1964 ed.). Section 201 (e) of the Act, 16 U.S.C. § 824(e), provides:
 "The term `public utility' when used in sections 824-825r of this title means any person who owns or operates facilities subject to the jurisdiction of the Commission under sections 824-824h of this title."
 And see Note 10 infra.
 
 
 [2]
 An accommodation has apparently been worked out between Colorado-Ute and the privately owned power companies which fought its first certificate of public convenience and necessity for its Hayden station, and the Colorado Public Utilities Commission has now issued a second certificate which seems to meet with their approval. (Decision No. 70608, December 22, 1967.) Nevertheless the case here is not mooted
 
 
 [3]
 Petitioners apparently hoped that if the Commission asserted jurisdiction over Colorado-Ute as a public utility and over its sales of Hayden-generated electric energy in interstate commerce, the Colorado law requirement of certification of facilities for the production of electric energy would be inapplicable to the plant
 
 
 [4]
 Executive Order No. 7037, issued May 11, 1935. The Rural Electrification Act, providing a statutory basis for the Administration, was enacted the following year. 7 U.S.C. §§ 901et seq. (1964 ed.).
 
 
 [5]
 32 FED.REG. 10817 (July 22, 1967)And see testimony of Edward Wilson, Deputy Assistant Administrator of REA, in Dairyland Power Cooperative et al., Docket No. E-7113.
 
 
 [6]
 Most of them have developed a "capital credits" plan by which all money over and above that required for operating costs is credited back to the member-owners who paid it in. Consequently neither the cooperative nor any individual can profit from the sale of electricity by the cooperative to its members
 
 
 [7]
 Section 201(f), 16 U.S.C. § 824(f), provides:
 "No provision in sections 824-824h of this title shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto."
 
 
 [8]
 The Commission went on to issue a precatory word to Congress, pointing out that jurisdiction over certain aspects of the major generating and transmission cooperatives, as opposed to those which merely transmit, distribute or generate only a small amount of electric energy, would be in the public interest. Dairyland Power Cooperative, 37 F.P.C. 12, 27-28 (1967). If the Commission had found that conditions in the power industry had so changed that generating cooperatives now did fall within its jurisdiction, this court would be faced with a different issue. For just as the Commission's determination here that it is without jursdiction is entitled to judicial deference, Philadelphia Television Broadcasting Co. v. F.C.C., 123 U.S.App.D.C. 298, 359 F.2d 282 (1966), so would be its determination that it had the requisite authority. Hardin v. Kentucky Utilities Company, 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968)
 
 
 [9]
 The legislative history of the Federal Power Act with respect to its bearing on electrical cooperatives is virtually nonexistent, for when the Act was passed in 1935 the Rural Electrification Administration had been created by executive order only a few months before and, prior to the Act, had made only a few very small loans to proposed cooperatives. The agency was not permanently established until Congress enacted the Rural Electrification Act in 1936, one year after the Federal Power Act
 
 
 [10]
 Section 201(e), 16 U.S.C. § 824(e), defines "public utility" to include "any person who owns or operates facilities subject to the jurisdiction of the Commission * * *." Section 3(4), 16 U.S.C. § 796 (4), defines "person" to include "corporations." Section 3(3), 16 U.S.C. § 796(3). defines "corporation" to include "any corporation, joint-stock company, partnership, association, business trust, [or] organized group of persons whether incorporated or not * * *." Section 201 (b), 16 U.S.C. § 824(b), provides, in pertinent part, that the "Commission shall have jurisdiction over all facilities for [the] transmission [in interstate commerce] or sale [in interstate commerce at wholesale] of electric energy * * *."
 
 
 [11]
 As Judge Hand memorably put it in Cabell v. Markham, 2 Cir., 148 F.2d 737, 739,affirmed, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945):
 "* * * Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning. * * *"
 
 
 [12]
 Title I, designated the Public Utility Holding Company Act, 15 U.S.C. §§ 79et seq. (1964 ed.), vests authority in the Securities and Exchange Commission to deal with the abuses arising from the holding company structure which then prevailed in the utilities industry.
 
 
 [13]
 2 1955 U.S.CODE CONG. & ADM. NEWS 2041-2042, 84th Cong., 1st Sess
 
 
 [14]
 80 CONG.REC. (Part 3) 3308, 3313 (1936)See also id. (Part 5) at 5277, 5281.
 
 
 [15]
 The repeated administrative practice of the Rural Electrification Administration in consistently affirming that agency's independence of the Commission has never been criticized by the successive Congresses to which it is by statute directed to report annually of its progress and activities
 
 
 [16]
 See, e. g., Teton Valley Power and Milling Co., Ltd., 24 F.P.C. 361 (1960); Frontier Power Co., 9 F.P.C. 1298 (1950); Montana-Dakota Utilities Co., 8 F.P.C. 869 (1949); Ark-La Electric Cooperative, Inc., 6 F.P.C. 1037 (1947).
 All ten cases cited by petitioners involved voluntary filings by cooperatives in proceedings where "no issue was raised as to the status of cooperatives as public utilities * * *." Dairyland Power Cooperative, supra Note 8, 37 F.P.C. at 25 n. 30.
 Petitioners also rely on two recent judicial decisions, Public Service Co. of Indiana, Inc. v. Federal Power Com'n. 7 Cir., 375 F.2d 100, cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 992 (1967), and Arkansas Power & Light Co. v. Federal Power Com'n, 8 Cir., 368 F.2d 376 (1966), to support their argument that REA-financed cooperatives are public utilities within the meaning of Part II of the Federal Power Act. But those cases simply hold that sales by public utilities to a cooperative are within the protection of the Act against unreasonable rates. Neither holds that cooperatives are themselves public utilities as defined in Part II. And in the Shrewsbury case (New England Power Company v. Federal Power Commission, 1 Cir., 349 F.2d 258 (1965)) the court held that municipally-owned utilities, which are expressly exempt from Part II of the Federal Power Act by Section 201(f), can nevertheless invoke the Act's protective provisions when they are resale customers of a non-exempt utility.
 
 
 [17]
 The Commission has not required cooperatives to file rates or maintain records or uniform accounts; nor has it considered the reasonableness of their rates or charges; it has not fixed adequate or proper rates of depreciation, or sought to exercise its investigative powers with respect to cooperatives; it has not asserted jurisdiction over the sale of one cooperative's facilities to another, and so on
 
 
 [18]
 The more recent amendatory attempts seem to have been prompted by the Commission's order to show cause in theDairyland case. The sponsors of these bills conceived them as confirming the cooperatives' independent status which seemed threatened by the Dairyland show cause order. In introducing S. 2028, Senator Humphrey explained: "The law is clear. We would not need new legislation except for the stubbornness of some people who are pursuing an illegal course in the face of the provisions of the law in this case, as expressly stated by Congress." 109 CONG.REC. (Part 11) 14533 (1963). See also the debate on S. 1459, 111 CONG.REC. (Part 16) 22018-22034 (1965).
 
 
 [19]
 See also McLaren v. Fleischer, 256 U. S. 477, 481, 41 S.Ct. 577, 578, 65 L.Ed. 1052 (1920), where the Supreme Court said: "[T]he practical construction given to an act of Congress, fairly susceptible of different constructions, by those charged with the duty of executing it is entitled to great respect and, if acted upon for a number of years, will not be disturbed except for cogent reasons." And see Udall v. Tallman, 380 U.S. 1, 18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).
 
 
 [20]
 Courts have repeatedly stressed that legislation should be interpreted in a way "consonant with the functions sought to be served by [it] * * *." Clark v. Uebersee Finanz-Korp., 332 U.S. 480, 489, 68 S.Ct. 174, 92 L.Ed. 88 (1947)See also Malat v. Riddell, 383 U.S. 569, 571-572, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); United States v. Shirey, 359 U.S. 255, 260-261, 79 S.Ct. 746, 3 L.Ed.2d 789 (1959); United States v. Ruzicka, 329 U.S. 287, 292, 67 S.Ct. 207, 91 L.Ed. 290 (1946); Utah Junk Co. v. Porter, 328 U.S. 39, 44, 66 S.Ct. 889, 90 L.Ed. 1071 (1946); Markham v. Cabell, 326 U.S. 404, 409, 66 S.Ct. 193, 90 L.Ed. 165 (1945); United States v. American Trucking Ass'ns, 310 U.S. 534, 543-544, 60 S. Ct. 1059, 84 L.Ed. 1345 (1940); Rector, etc. of Holy Trinity Church v. United States, 143 U.S. 457, 459-462. 12 S.Ct. 511, 36 L.Ed. 226 (1892); Shaffer v. Singh, 120 U.S.App.D.C. 42, 44, 343 F.2d 324, 326 (1965).